## MYERS AND OTHERS *v.* ANDERSON.

## SAME *v.* HOWARD.

## SAME *v.* BROWN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MARYLAND.

Nos. 8, 9, 10.  Argued November 11, 1913.—Decided June 21, 1915.

*Guinn* v. *United States, ante,* p. 347, followed as to the effect and operation of the Fifteenth Amendment and that a State may not establish as a standard for exercising suffrage a standard existing prior to the adoption of that Amendment and which was rendered illegal thereby.
While the Fifteenth Amendment does not confer the right of suffrage on any class, it does prohibit the States from depriving any person of the right of suffrage whether for Federal, state or municipal elections.

Election officers who refuse to allow persons to exercise their suffrage because of a state law disqualifying them according to a standard made unconstitutional by the Fifteenth Amendment are liable for damages in a civil action under § 1979, Rev. Stat.

Where the standards fixed for voters are several in number, but are all so interrelated that one cannot be held invalid without affecting the others, the entire provision must fail.

Where a statute establishing qualifications for exercising suffrage is unconstitutional, it does not deprive the citizens of the right to vote, as the previously existing statute is unaffected by the attempted adoption of one that is void for unconstitutionality.

The so-called Grandfather Clause in the statute of Maryland of 1908 fixing the qualifications of voters at municipal elections in the City of Annapolis, based on the right of the citizen or his ancestor to vote at a date prior to the adoption of the Fifteenth Amendment is unconstitutional because the standards then existing have been made illegal by the self-operating force of the Fifteenth Amendment.

182 Fed. Rep. 223, affirmed.

THE facts, which involve the constitutionality under the Fifteenth Amendment to the Constitution of the United States, of the statute of Maryland fixing qualification of voters and containing what has been known as the Grandfather's Clause, and the construction and application of § 1979, Rev. Stat., are stated in the opinion.

*Mr. William L. Marbury* and *Mr. Ridgley P. Melvin,* with whom *Mr. William L. Rawls* was on the brief, for plaintiff in error:

The cases at bar are controlled by the case of *Giles* v. *Harris,* 189 U. S. 475.

The portions of § 4 of the Annapolis Registration Law which are alleged in the declaration to be void because of being in conflict with the Fifteenth Amendment, constitute the only part of that law which makes any change in the preëxisting law prescribing qualifications for registration and suffrage in the City of Annapolis.

The legislature would, therefore, certainly not have enacted this law without these provisions. Therefore,

an averment that these provisions are void is equivalent
to an averment that the whole Annapolis Registration
Law is void. Therefore, under *Giles* v. *Harris* the plain-
tiffs are not entitled to maintain the suit.

Aside from the above, and irrespective of the allega-
tions of the declaration, it is plain that the Annapolis
Registration Law is either valid as a whole or void as a
whole. But the defendants as registrars had no power or
authority to register the plaintiffs, except such as was
derived from this law. It is admitted that they were
appointed under that law, and had no power to act under
any other law. If, therefore, the law in question is void,
they had no power or legal authority to register the plain-
tiffs, and the plaintiffs cannot recover damages against
them on account of their failure to do so.

Even if the court were to be of opinion that Class 3,
the so-called Grandfather's Clause, alone was void, that
it was separable from the balance of the act, and that the
balance of the act was valid, still the plaintiffs would not
be entitled to recover, because it is admitted that they
were disqualified under Classes 1, 2 and $2\frac{1}{2}$, the Prop-
erty Clause, and Naturalized Citizen Clause of the
act.

Conclusion: It follows that the question as to whether
the Annapolis Registration Act or the Grandfather's
Clause of that act is valid or invalid, constitutional or
unconstitutional, is not involved in this case, and will not
be passed upon by the court, for the reason that in neither
event are the plaintiffs entitled to recover.

Such a conclusion will not mean that the Fifteenth
Amendment is waste paper and cannot be enforced. If
that Amendment is applicable to state elections and munic-
ipal elections, it can be enforced in a case like this by
Congress by legislation directed at the State of Maryland
instead of at individuals, as authorized by § 2 of the Fif-
teenth Amendment, under which Congress is empowered

to compel a State to obey the Amendment by "appropriate legislation."

The Grandfather's Clause is not violative of the Fifteenth Amendment. Even if this clause excluded all negroes, it would not necessarily follow that they were excluded on account of their race. They might have been excluded on account of their politics. They might have been excluded on account of some characteristic, mental, moral or temperamental, such exclusion might be entirely unjust or morally wrong, but it would not be violative of the Fifteenth Amendment.

The declarations filed in these cases are insufficient in law, because they fail to allege that the action of the defendants in refusing to register the plaintiffs was corrupt or malicious.

Malice is an essential allegation in a suit of this kind against registration officers at common law.

The few cases holding the contrary are based upon a mistaken view of what was decided in *Ashby* v. *White.*

Revised Stat., § 1979, under which these suits are brought, gives no new or different right of action from that given by the common law, but only such right of action as would be a proper proceeding for redress at common law, and does not dispense with the necessity of alleging and proving malice.

Revised Stat., § 1979, has no application to the cases at bar, because it was passed solely to protect the civil rights guaranteed or secured under the Fourteenth Amendment, *Holt* v. *Indiana Mfg. Co.*, 176 U. S. 68; *Wadleigh* v. *Newhall*, 136 Fed. Rep. 946.

In any event, the acts complained of by plaintiffs do not constitute a deprivation of any right, privilege or immunity secured by the Constitution and laws of the United States within the meaning of Rev. Stat., § 1979. *Carter* v. *Greenhow*, 114 U. S. 317.

The inhibitions contained in the Fifteenth Amendment

against the denial or abridgment of the right of citizens of the United States to vote on account of race, color or previous condition of servitude, is by the plain language of the Amendment made to apply only to the right to vote which citizens of the United States have by virtue of such citizenship, that is, the right to vote derived from the United States, and not such right to vote as they derive from the States, and the inhibition therein contained does not apply to or in any way affect the right of a citizen of a State to vote at state or municipal elections, such right being derived exclusively from the State, and not inhering in any man in his capacity as a citizen of the United States.

The Fourteenth Amendment provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." This inhibition applies only to privileges or immunities of citizens of the United States as such, as distinguished from the citizens of a State. The canon of construction announced in *Slaughter House Cases* equally applicable to the Fifteenth Amendment, which is in precisely similar language.

The distinction between national and state citizenship and their respective privileges there drawn, i. e., in *Slaughter House Cases*, has come to be firmly established. *Twining* v. *New Jersey*, 211 U. S. 96.

The legislative history of the Fifteenth Amendment confirms the above as a proper construction. As originally introduced, the amendment read: "No State shall deny or abridge the right of its citizens to vote and hold office on account of race, color or previous condition." The Judiciary Committee reported back the resolution, striking out the words "the right of its citizens" (i. e., the citizens of the State), and substituting the words "the right of citizens of the United States to votes."

The right to vote for members of Congress is a right

possessed by a citizen of the United States as such, said right being derived primarily not from a State, but from the United States. *Ex parte Yarbrough,* 110 U. S. 651; *Wiley* v. *Sinkler,* 179 U. S. 58; *Swafford* v. *Templeton,* 185 U. S. 491.

The opinions expressed by members of Congress during the debate on the Amendment do not constitute any guide for its construction. The meaning of the act must be determined from the language used therein. *United States* v. *Freight Association,* 166 U. S. 318.

From *United States* v. *Reese,* 92 U. S. 214, to *James* v. *Bowman,* 190 U. S. 122, the courts have overruled the construction placed by Congress on the Fifteenth Amendment by striking down as unconstitutional the statutes passed to enforce it.

The question of the applicability of the inhibitions of the Fifteenth Amendment to state or municipal elections were not necessarily involved in those cases, the point was not raised or considered, and therefore cannot be deemed to have been adjudicated. *Neal* v. *Delaware,* 103 U. S. 370.

The words "right of a citizen of the United States to vote" in the Fifteenth Amendment do not in any event mean or refer to the right to vote in corporate bodies created solely by legislative will, and wherein such right is dependent altogether upon legislative discretion, as in municipal corporations.

The words "right to vote" as used in the statutes or constitutions generally means the right to vote at elections of a public general character, and not at municipal elections. There is a great weight of authority to this effect, especially Maryland cases.

If construed to have reference to voting at state or municipal elections, the Fifteenth Amendment would be beyond the amending power conferred upon three-fourths of the States by Art. V of the Constitution, and therefore, the Amendment should not receive that construction, it

is fairly open to a more limited construction. *Knights Templar Indemnity Co.* v. *Jarman*, 187 U. S. 197.

Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 407.

The right to determine for itself who shall constitute its electorate, is one of the functions essential to the existence of a State, and any invasion of that right is beyond the power of amendment conferred upon three-fourths of the States by the people in the adoption of the Constitution; otherwise there could be no indestructible States. *Texas* v. *White*, 7 Wall. 700; *Lane County* v. *Oregon*, 7 Wall. 71.

If construed to be applicable to state or municipal elections, the Fifteenth Amendment would fall within the express prohibition contained in Art. V of the Constitution against any amendment which would deprive a State of its equal representation in the Senate without its consent. *Texas* v. *White*, 7 Wall. 700; article by Arthur W. Machen, Jr., in 23 Har. Law Review, pp. 169 to 193.

Numerous authorities of this and other courts besides these cited support these contentions.

*Mr. Edgar H. Gans*, with whom *Mr. Morris A. Soper* and *Mr. Daniel R. Randall* were on the brief, for defendant in error:

The evidence was legally sufficient.

It is not necessary that wrong should be willful and malicious.

A specific right to vote is given substantially in this case by the Fifteenth Amendment.

There is a remedy by act of Congress and § 1979, Rev. Stat., applies.

The Fifteenth Amendment applies to municipal elections.

The Act of 1908 is only void in part.

The Fifteenth Amendment extends to state elections.

In support of these contentions, see *Aultman* v. *Brownfield,* 102 Fed. Rep. 13; *Bevard* v. *Hoffman,* 18 Maryland, 479; *Brickhouse* v. *Brooks,* 165 Fed. Rep. 534; *Carter* v. *Greenhow,* 114 U. S. 317; *Civil Rights Cases,* 109 U. S. 3; *County Com.* v. *Duckett,* 20 Maryland, 478; *Dwight* v. *Rice,* 5 La. Ann. 580; *Ellis* v. *United States,* 206 U. S. 246; *Gibson* v. *Mississippi,* 162 U. S. 591; *Giles* v. *Harris,* 189 U. S. 475; *Hambleton* v. *Rathborn,* 175 U. S. 144; *Hanna* v. *Young,* 84 Maryland, 179; *Hemsley* v. *Myers,* 45 Fed. Rep. 290; *Holt* v. *Indiana Mfg. Co.,* 176 U. S. 68; *Howell* v. *Pate,* 119 Georgia, 539; *Iowa* v. *Des Moines,* 96 Iowa, 186; *Karem* v. *United States,* 121 Fed. Rep. 252; *McCain* v. *Des Moines,* 174 U. S. 175; *Neale* v. *Delaware,* 103 U. S. 370; *Pattison* v. *Bark Eudora,* 190 U. S. 169; *Pope* v. *Williams,* 98 Maryland, 66; *S. C.,* 193 U. S. 621; *Shaeffer* v. *Gilbert,* 73 Maryland, 66; *Sutherland* v. *Norris,* 74 Maryland, 326; *United States* v. *Bowman,* 100 U. S. 508; *United States* v. *Cruikshank,* 25 Fed. Rep. 712; *United States* v. *Lackey,* 99 Fed. Rep. 956; *United States* v. *Oregon Co.,* 164 U. S. 256; *United States* v. *Reese,* 92 U. S. 214; *Vietor* v. *Arthur,* 104 U. S. 498; *Wadley* v. *Newhall,* 136 Fed. Rep. 946; *Willis* v. *Kalmbach,* 64 S. E. Rep. 342; *Wood* v. *Fitzgerald,* 3 Oregon, 563; *Ex parte Yarbrough,* 110 U. S. 651; see also Acts of May 31, 1870, c. 114, now Rev. Stat., § 2004, and Act of Apr. 20, 1871, c. 22, now Rev. Stat., § 1979; Acts of Assembly of Maryland, 1908, c. 525 and of 1896, c. 202, § 38; Constitution of Maryland, Art. I, § 1.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

These cases involve some questions which were not in the *Guinn Case,* No. 96, just decided, *ante,* p. 347. The

foundation question, however, is the same, that is, the operation and effect of the Fifteenth Amendment.

Prior to the adoption of the Fifteenth Amendment the privilege of suffrage was conferred by the constitution of Maryland of 1867 upon "every white male citizen," but the Fifteenth Amendment by its self-operative force obliterated the word white and caused the qualification therefor to be "every male citizen" and this came to be recognized by the Court of Appeals of the State of Maryland. Without recurring to the establishment of the City of Annapolis as a municipality in earlier days or following the development of its government, it suffices to say that before 1877 the right to vote for the governing municipal body was vested in persons entitled to vote for members of the General Assembly of Maryland, which standard by the elimination of the word white from the constitution by the Fifteenth Amendment embraced "every male citizen." In 1896 a general election law comprising many sections was enacted in Maryland. (Laws of 1896, c. 202, p. 327.) It is sufficient to say that it provided for a board of supervisors of elections in each county to be appointed by the governor and that this board was given the power to appoint two persons as registering officers and two as judges of election for each election precinct or ward in the county. Under this law each ward or voting precinct in Annapolis became entitled to two registering officers. While the law made these changes in the election machinery it did not change the qualification of voters.

In 1908 an act was passed "to fix the qualifications of voters at municipal elections in the City of Annapolis and to provide for the registration of said voters." (Laws of 1908, c. 525, p. 347.) This law authorized the appointment of three persons as registers, instead of two, in each election ward or precinct in Annapolis and provided for the mode in which they should perform their duties and conferred the right of registration and consequently the

right to vote on all male citizens above the age of twenty-one years who had resided one year in the municipality and had not been convicted of crime and who came within any one of the three following classes:

"1. All taxpayers of the City of Annapolis assessed on the city books for at least five hundred dollars. 2. And duly naturalized citizens. 2½. And male children of naturalized citizens who have reached the age of twenty-one years. 3. All citizens who, prior to January 1, 1868, were entitled to vote in the State of Maryland or any other State of the United States at a state election, and the lawful male descendants of any person who prior to January 1, 1868, was entitled to vote in this State or in any other State of the United States at a state election, and no person not coming within one of the three enumerated classes shall be registered as a legal voter of the City of Annapolis or qualified to vote at the municipal elections held therein, and any person so duly registered shall, while so registered, be qualified to vote at any municipal election held in said city; said registration shall in all other respects conform to the laws of the State of Maryland relating to and providing for registration in the State of Maryland."

The three persons who are defendants in error in these cases applied in Annapolis to the board of registration to be registered as a prerequisite to the enjoyment of their right to vote at an election to be held in July, 1909, and they were denied the right by a vote of two out of the three members of the board. They consequently were unable to vote. Anderson, the defendant in error in No. 8, was a negro citizen who possessed all the qualifications required to vote exacted by the law in existence prior to the one we have just quoted, and who on January 1, 1868, the date fixed in the third class in the act in question, would have been entitled to vote in Maryland but for the fact that he was a negro, albeit he possessed none of the

particular qualifications enumerated by the statute in question. Howard, the defendant in error in No. 9, was a negro citizen possessing all the qualifications to vote required before the passage of the act in question, whose grandfather resided in Maryland and would have been entitled to vote on January 1, 1868, but for the fact that he was a negro. Brown, the defendant in error in No. 10, also had all the qualifications to vote under the law previously existing and his father was a negro residing in Maryland who would have been able to vote on the date named but for the fact that he was a negro. The three parties thereupon began these separate suits to recover damages against the two registering officers who had refused to register them on the ground that thereby they had been deprived of a right to vote secured by the Fifteenth Amendment and that there was liability for damages under § 1979, Rev. Stat., which is as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and Laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The complaints were demurred to and it would seem that every conceivable question of law susceptible of being raised was presented and considered, and the demurrers were overruled, the grounds for so doing being stated in one opinion common to the three cases (182 Fed. Rep. 223). The cases were then tried to the court without a jury, and to the judgments in favor of the plaintiffs which resulted these three separate writs of error were prosecuted.

The non-liability in any event of the election officers for their official conduct is seriously pressed in argument, and

it is also urged that in any event there could not be liability under the Fifteenth Amendment for having deprived of the right to vote at a municipal election. But we do not undertake to review the considerations pressed on these subjects because we think they are fully disposed of by the ruling this day made in the *Guinn Case* and by the very terms of § 2004, Rev. Stat., when considered in the light of the inherently operative force of the Fifteenth Amendment as stated in the case referred to.

This brings us to consider the statute in order to determine whether its standards for registering and voting are repugnant to the Fifteenth Amendment. There are three general criteria. We test them by beginning at the third, as it is obviously the most comprehensive and, as we shall ultimately see, the keystone of the arch upon which all the others rest. In coming to do so it is at once manifest that barring some negligible changes in phraseology that standard is in all respects identical with the one just decided in the *Guinn Case* to be repugnant to the Fifteenth Amendment and we pass from its consideration and approach the first and a subdivision numbered 2½. The first confers the right to register and vote free from any distinction on account of race or color upon all taxpayers assessed for at least $500. We put all question of the constitutionality of this standard out of view as it contains no express discrimination repugnant to the Fifteenth Amendment and it is not susceptible of being assailed on account of an alleged wrongful motive on the part of the lawmaker or the mere possibilities of its future operation in practice and because as there is a reason other than discrimination on account of race or color discernible upon which the standard may rest, there is no room for the conclusion that it must be assumed, because of the impossibility of finding any other reason for its enactment, to rest alone upon a purpose to violate the Fifteenth Amendment. And as in order to dispose of the case, as

we shall see, it is not necessary to examine the constitutionality of the other standards, that is, numbers 2 and $2\frac{1}{2}$ relating to naturalized citizens and their descendants, merely for the sake of argument we assume those two standards, without so deciding, to be also free from constitutional objection and come to consider the case under that hypothesis.

The result then is this, that the third standard is void because it amounts to a mere denial of the operative effect of the Fifteenth Amendment and, based upon that conception, proceeds to re-create and reëstablish a condition which the Amendment prohibits and the existence of which had been previously stricken down in consequence of the self-operative force of its prohibitions; and the other standards separately considered are valid or are assumed to be such and therefore are not violative of the Fifteenth Amendment. On its face, therefore, this situation would establish that the request made by all the plaintiffs for registration was rightfully refused since even if the void standard be put wholly out of view, none of the parties had the qualifications necessary to entitle them to register and vote under any of the others. This requires us therefore to determine whether the two first standards which we have held were valid or have assumed to be so must nevertheless be treated as non-existing as the necessary result of the elimination of the third standard because of its repugnancy to the prohibition of the Fifteenth Amendment. And by this we are brought therefore to determine the interrelation of the provisions and the dependency of the two first including the substandard under the second upon the third; in other words, to decide whether or not such a unity existed between the standards that the destruction of one necessarily leaves no possible reason for recognizing the continued existence and operative force of the others.

In the *Guinn Case* this subject was also passed upon and

it was held that albeit the decision of the question was in the very nature of things a state one, nevertheless in the absence of controlling state rulings it was our duty to pass upon the subject and that in doing so the overthrow of an illegal standard would not give rise to the destruction of a legal one unless such result was compelled by one or both of the following conditions: (a) Where the provision as a whole plainly and expressly established the dependency of the one standard upon the other and therefore rendered it necessary to conclude that both must disappear as the result of the destruction of either; and (b) where even although there was no express ground for reaching the conclusion just stated, nevertheless that view might result from an overwhelming implication consequent upon the condition which would be created by holding that the disappearance of the one did not prevent the survival of the other, that is, a condition which would be so unusual, so extreme, so incongruous as to leave no possible ground for the conclusion that the death of the one had not also carried with it the cessation of the life of the other.

That both of these exceptions here obtain we think is clear: First, because looking at the context of the provision we think that the obvious purpose was not to subject to the exactions of the first standard (the property qualification) any person who was included in the other standards; and second, because the result of holding that the other standards survived the striking down of the third would be to bring about such an abnormal result as would bring the case within the second exception, since it would come to pass that every American born citizen would be deprived of his right to vote unless he was able to comply with the property qualification and all naturalized citizens and their descendants would be entitled to vote without being submitted to any property qualification whatever. If the clauses as to naturalization were

assumed to be invalid, the incongruous result just stated would of course not arise, but the legal situation would be unchanged since that view would not weaken the conclusion as to the unity of the provisions of the statute, but on the contrary would fortify it.

But it is argued even although this result be conceded, there nevertheless was no right to recover and there must be a reversal since if the whole statute fell, all the clauses providing for suffrage fell and no right to suffrage remained and hence no deprivation or abridgment of the right to vote resulted. But this in a changed form of statement advances propositions which we have held to be unsound in the Guinn Case. The qualification of voters under the constitution of Maryland existed and the statute which previously provided for the registration and election in Annapolis was unaffected by the void provisions of the statute which we are considering. The mere change in some respects of the administrative machinery by the new statute did not relieve the new officers of their duty nor did it interpose a shield to prevent the operation upon them of the provisions of the Constitution of the United States and the statutes passed in pursuance thereof. The conclusive effect of this view will become apparent when it is considered that if the argument were accepted, it would follow that although the Fifteenth Amendment by its self-operative force without any action of the State changed the clause in the constitution of the State of Maryland conferring suffrage upon "every white male citizen" so as to cause it to read "every male citizen," nevertheless the Amendment was so supine, so devoid of effect as to leave it open for the legislature to write back by statute the discriminating provision by a mere changed form of expression into the laws of the State and for the state officers to make the result of such action successfully operative.

There is a contention pressed concerning the applica-

tion of the statute upon which the suits were based to the acts in question. But we think in view of the nature and character of the acts, of the self-operative force of the Fifteenth Amendment and of the legislation of Congress on the subject that there is no ground for such contention.

*Affirmed.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of these cases.