Annette L. BAXTER, individually and on behalf of her minor children Sheramites Noel, Willie M. Baxter and Sharon Baxter, Plaintiffs,

v.

Charline J. BIRKINS, individually and as Director of the Colorado State Department of Public Welfare, James L. Treece, Frank D. Allen, Roy A. Davis, Damian P. Ducy, Lorna Hart, Glenn Sheriff, Henry J. Tupper, Peter Samac and Dr. James A. Henderson, individually and as constituting the Colorado State Board of Public Welfare, Bernard Valdez, individually and as Manager of the Denver Department of Welfare of the City and County of Denver, Orlando Romero, individually and as Director of the Denver Department of Welfare of the City and County of Denver, Defendants.

Civ. A. No. 67-C-541.

United States District Court,
D. Colorado.

March 19, 1970.

Richard F. Hennessey, Jr., Howard I. Rosenberg and James E. Seckinger, Denver, Colo., for plaintiffs.

Douglas D. Doane, Sp. Asst. Atty. Gen., Denver, Colo., for Charline J. Birkins, individually and as Director of the Colorado State Dept. of Public Welfare, and the Colorado State Bd. of Public

Welfare and the members individually and as constituting the Board.

Frank A. Elzi, Denver, Colo., for Bernard Valdez and Orlando Romero, individually and respectively as Manager and Director of the Denver Dept. of Welfare of the City and County of Denver.

## MEMORANDUM OPINION AND ORDER

Before LEWIS, Circuit Judge, and ARRAJ and DOYLE, District Judges.

ARRAJ, District Judge.

This action was instituted by plaintiffs on November 14, 1967 asking this Court to determine the constitutionality of the Colorado statute which imposes a requirement of residency of one year as a condition to receipt of welfare assistance in the form of Aid to Dependent Children. In addition to this declaratory relief plaintiffs have asked for an injunction prohibiting enforcement of the statute and for damages in the amount of welfare benefits withheld because plaintiffs did not meet the conditions of the statute. Jurisdiction is invoked pursuant to 42 U.S.C. § 1983; 28 U.S.C. § 1343; 28 U.S.C. §§ 2201 and 2202; and 28 U.S.C. §§ 2281 and 2284. There were no contested issues of fact.

Plaintiffs are Mrs. Annette Baxter and her three minor children. Mrs. Baxter applied for welfare assistance in the form of Aid to Dependent Children (ADC) at the Denver, Colorado, Department of Welfare on August 17, 1967. Her application was refused. The sole basis for this refusal was that she had not lived within the State of Colorado for one year as required by Colo.Rev. Stat.Ann. (1967 Perm.Supp.) 119–9–4(1)(a)(b).[1]

Two issues are before us for adjudication. The first is whether Colo.Rev. Stat.Ann. 119–9–4(1)(a)(b) is unconstitutional. The second is whether, if it is, these plaintiffs can recover monies unlawfully withheld.

Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), is dispositive of the first question. In that case ADC statutes of two states and the District of Columbia were found to contain unconstitutional residency requirements. The Court found that the residency requirements deprived the plaintiffs of the right to equal protection of the laws and the right to travel interstate.

Defendants' only hope of prevailing in this action would be to distinguish the Colorado statute from those ruled upon in *Shapiro*. They have not attempted to do so. Nor, do we think, they could. The statutes are devoid of significant distinction. Their effect is the same. We think it unnecessary, therefore, to reiterate the extensive *Shapiro* analysis of the statutes and of the asserted justifications for the residency requirements. That analysis applies here. The Colorado statute deprived these plaintiffs of rights secured by the United States Constitution. It is, therefore, void.

The remaining question is whether or not plaintiffs are entitled to monies unlawfully withheld, either in the form of damages against the defendants as individuals or in the form of back payments from the State. Plaintiffs argue earnestly and extensively, in their briefs and on oral argument, that 42 U. S.C. § 1983 provides a remedy against defendants as individuals.[2] We disa-

---

1. The Colorado Statute reads in pertinent part as follows: Colo.Rev.Stat.Ann. 119–9–4 *Eligibility for Assistance.*

    (1) (a) Assistance shall be given under this article to any dependent child who:

    (b) Has resided in the state for one year immediately preceding the application for such assistance; or was born within one year immediately preceding the application, if the parent or other rela-

tives with whom the child is living has resided in the state for one year immediately preceding the birth of said child.

2. § 1983. *Civil action for deprivation of rights.*

    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of

gree. To apply § 1983 to these defendants as individuals would require an interpretation of that statute strained beyond the breaking point.

To begin with, we cannot ignore the setting in which the statute which is now § 1983 was brought into being. It was passed by the Forty Second Congress in response to a letter from President Grant citing "A condition of affairs * * * [then existing] * * * in some States of the Union rendering life and property insecure * * *"[3] It is not insignificant that the statute was referred to as the "Ku Klux Act". The Congressional debates quoted by the Supreme Court in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961),[4] contain continual references to the violence then being inflicted upon blacks by whites, primarily in the South.[5] It was out of this state of lawlessness, representing a contempt for the guaranties of the Fourteenth Amendment, that § 1983 was born.

This of course does not mean that § 1983 deals only with an extremely narrow and specific field of misconduct. The outrages committed by the Ku Klux Klan and other groups were only a catalyst and not the sole object of the statute. As the Supreme Court noted in Monroe v. Pape, *supra*, § 1983 has several purposes.[6] But the historical context does suggest that the statute was not passed as an abstract afterthought to the Fourteenth Amendment. Though the remedy provided is broad, it does not dictate damages for the conduct involved in the case before us.

█ We take the statement of the Supreme Court in Monroe v. Pape, *supra*, and reiterated in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), that the statute is to be "read against the background of tort liability which makes a man responsible for the natural consequences of his actions" to mean what it says. Plaintiffs apparently would have us believe that the phrase means that some "basic test common to all civil actions" is to be applied under § 1983.[7] Though we are not at all sure what that means, we think that any such interpretation is inaccurate. It is belied by a careful reading of *Monroe*. All the opinions in that case —majority, concurring, and dissenting

the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. See Monroe v. Pape, 365 U.S. 172, 173, 81 S.Ct. 476 (1961).

4. We believe that any discussion of the application of § 1983 must use this landmark case as a reference point. We doubt the significance of the earlier cases cited by plaintiffs dealing only peripherally with § 1983. *E. g.*, Myers v. Anderson and Lane v. Wilson, *infra*.

5. The Court notes that the law was passed by a Congress "that had the Klan 'particularly in mind.' ", 365 U.S. at 174, 81 S.Ct. at 477, and further, that perhaps the main "scourge of the evil" was the Klan. 365 U.S. at 175, 81 S.Ct. 473.

6. The Court noted that the Congressional debates on the statutes read in their entirety indicate that § 1983 had three basic aims:

  1. The statute would override certain kinds of state laws, i. e., invidious legislation by the states abridging rights and privileges of citizens of the United States.
  2. The statute would provide a remedy where state law is inadequate.
  3. The third aim is broader. It is providing a remedy where the state remedy, though adequate in theory, was not available in practice.

7. The Court, in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), and Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), had interpreted 18 U.S.C. § 242, the criminal counterpart to 42 U.S.C. § 1983, to require a finding of a "specific intent to deprive a person of a federal right." 325 U.S. at 103, 65 S.Ct. at 1036. Plaintiffs argue that specific intent is a basic standard of criminal law, and that by its reference to tort law in *Monroe*, the Court was merely being consistent by adopting a standard common to all civil actions.

—are replete with references to tort law.[8] Nowhere can we find an indication that the broader category urged by plaintiffs was contemplated. We thus conclude that the phrase means that there must be some degree of culpability involved before an action can be maintained under § 1983.

We do not, of course, hold that the wrongful acts must be done with specific intent to deprive a person of a federally protected right. That interpretation was explicitly refused by the Court in *Monroe*.[9] We do believe, however, that reading the statute "against the background of tort law" means that there must be "wrongful" acts.[10] It seems that Pierson v. Ray, *supra*, clearly dictates this interpretation of the statute.

The case at bar involves defendants whose duty it was to enforce state statutes. They would have been violating state law had they not done so. The particular statute involved in this case has since been declared unconstitutional.[11] Plaintiffs would have us believe that the acts were wrongful because at the time these defendants enforced this statute against these plaintiffs, defendants knew or should have known that the statute was unconstitutional. Several federal courts had invalidated similar laws. According to plaintiffs, when the acts in question were done in 1967, the issue was so firmly resolved that no reasonable man would have thought that the statute was con-

stitutional. We disagree. As counsel for defendants aptly point out, the unconstitutionality of such statutes was not so clear to the Chief Justice a year and a half later when Shapiro v. Thompson, *supra*, was decided. Nor, we might add, was it so clear to Justices Black and Harlan, who also dissented from the majority in *Shapiro*. Consequently, as we view it, the situation in 1967 was one in which a question had been raised about the constitutionality of residency requirements, but had not been fully decided.

Were the situation actually that as urged by plaintiffs the result might be different. Had Colorado passed a law in defiance of the Federal Constitution, and had these officials enforced it, then an action in damages would likely be proper under § 1983. In such a situation an official would have violated the supreme law of the land and merely attempted to shield himself behind a clearly invalid State statute. *See, e.g.*, Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), where an official was liable for enforcing an Oklahoma statute which "* * * was obviously directed towards the consequences of the decision in Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 *supra*." 307 U.S. at 270, 59 S.Ct. at 873. (Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), had struck down a previous attempt by the Oklahoma legislature to preclude Negroes from voting by the device of a "grandfather clause".)

---

8. The Congressional debates quoted in *Monroe* almost universally discuss conduct of an even more limited nature—that which is or should be punished criminally.

9. 365 U.S. at 187, 81 S.Ct. 473.

10. It should be noted that in Myers v. Anderson, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349 (1915), cited by plaintiffs as an early example of recovery of damages under § 1983, (then § 1979 Rev. Stat.), there was a suggestion of malicious or wrongful conduct, though the point was not discussed at length by the Court. Defendants in that case had argued that

malice was an essential allegation in a suit under. § 1979. Apparently in response to this argument, the Court noted:
There is a contention pressed concerning the application of the statute upon which the suits were based to the acts in question. But we think in view of the nature and character of the acts, of the self-operative force of the Fifteenth Amendment and of the legislation of Congress on the subject that there is no ground for such contention. 238 U.S. at 382, 383, 35 S.Ct. at 936.

11. Passmore v. Birkins. 311 F.Supp. 588 (D.C.Colo.1969).

But that is not the situation with which we are confronted. Rather, defendants here are state officials who were engaged in performance of their duties under state statutes. There is no suggestion in the record that their acts were done in anything but good faith.[12] The acts were wrongful only in the sense that the United States Supreme Court declared, a year and a half later, that the rights involved were protected by the United States Constitution.[13] This situation is controlled by Pierson v. Ray, *supra*. We disagree with plaintiff's attempts to distinguish that case. We are not persuaded that the decision was meant to be limited to state officers of the same character as police officers —lower in the state hierarchy, forced to make quick decisions, perhaps less skilled in legal niceties and with fewer responsibilities. Nor are we persuaded that there is any good reason for so limiting *Pierson*. For as the fact of dissenting opinions in *Shapiro* dramatizes, no amount of time and no amount of legal skill could insure a correct decision in the circumstances. The officials here are no less protected by the defense of good faith than were the police officers in *Pierson*; the Court's comments in that case are appropriate:

> A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid as applied. 386 U.S. at 555, 87 S.Ct. at 1218.

We believe that the core of plaintiffs' position must be that these state officials must be brought to court to personally account for failing to "predict the future course of constitutional law." 386 U.S. at 557, 87 S.Ct. at 1219. That argument must fall. The historical context, the *Monroe* analysis, and the strong *Pierson* direction are conclusive. Defendants cannot be held personally liable for their acts in this case.

■ That does not, however, fully dispose of the problem. Here benefits to which plaintiffs were entitled have been withheld, albeit by officials acting in good faith. A number of recent cases have been confronted with this problem and have ordered payment of withheld benefits. *See* Thompson v. Shapiro, 270 F.Supp. 331 (D.Conn.1967), aff'd, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; Cooley v. Juras, No. 67–662 (U.S.D.C., D.Ore.), June 27, 1969; Damico v. California, ¶ 10, 478 CCH Poverty Law Reports 11, 371; Machado v. Hackney, 299 F.Supp. 644 (W.D.Tex.1969); Gaddis v. Wyman, 304 F.Supp. 717 (S.D.N.Y. 1969); Alvarez v. Hackney and Sweetan v. Hackney, Nos. 68–18–5A and 5A69CA 128 (W.D.Tex., San Antonio Div., decided September 30, 1969); Brooks v. Yeatman, 311 F.Supp. 364 (M.D.Tenn. 1970).

We agree with the result reached in these cases. Any other result would violate the spirit of the supremacy clause. It is therefore,

Ordered that Colo.Rev.Stat.Ann. 119–9–4(1)(a)(b) be and the same hereby is declared to violate the Constitution of the United States. It is further

Ordered that plaintiffs shall be reimbursed to the extent that they were deprived of welfare benefits for failure to meet the requirements of Colo.Rev.Stat. Ann. 119–9–4(1)(a)(b).

---

12. We do not discuss here the niceties of proper pleading—that is whether the character of the conduct should be pleaded by the plaintiff or whether it should be raised by way of defense to a prima facie case. The record before us clearly indicates that the acts in question were not done in bad faith. Nowhere in the record is there an indication of anything to the contrary.

13. We do not, of course, mean in any way to disregard the importance of those rights. We merely mean that the existence of the particular rights was not free from doubt in 1967.