Gregory N. **ALDRIDGE**, a citizen and resident of the State of Tennessee and the United States

v.

Andrew **MULLINS**, an officer of the Metropolitan Police Department of Nashville-Davidson County, Tennessee.

Civ. A. No. 6318.

United States District Court,
M. D. Tennessee,
Nashville Division.

April 27, 1972.

Lionel R. Barrett, Jr., Nashville, Tenn., for plaintiff.

James H. Harris, III, Metropolitan Atty., Nashville, Tenn., for defendant.

## MEMORANDUM OPINION

MORTON, District Judge.

This is an action for damages brought under 42 U.S.C. § 1983. The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1343.

Plaintiff Gregory N. Aldridge claims that he was unlawfully assaulted by the defendant police officer, Andrew Mullins, on the evening of September 30, 1970. Plaintiff maintains that the alleged assault was committed "under color of law" in the defendant's capacity as a police officer of the Nashville Metropolitan Police Department. Plaintiff further maintains that defendant deprived plaintiff of certain civil rights, privileges, and immunities secured to him by the Constitution of the United States. Plaintiff asserts that as a result of the defendant's conduct he has suffered permanent physical injury and disability and seeks to recover both compensatory and punitive damages from the defendant officer.

Defendant denies that he assaulted plaintiff; that he fired his weapon at the plaintiff; that he acted under color of law toward the plaintiff; or that he deprived plaintiff of any civil rights, privileges or immunities secured to him by the Constitution of the United States in violation of 42 U.S.C. § 1983.[1]

1. The parties stipulated that plaintiff was convicted on two counts of robbery with a deadly weapon on October 26, 1970. This conviction had no connection with the inci-

## FACTS

### A. *Plaintiff's Version*

On the evening of September 30, 1970, plaintiff was visiting with two friends, Dorris Victory and Ricky Nix, at a neighbor's home (the Maxwell house) which was only two houses from plaintiff's home. At approximately 10:30 p. m., plaintiff was told by his brother Keith Aldridge that their mother, Mrs. Ruby Aldridge, wanted plaintiff to return home. Shortly thereafter, plaintiff, Victory, and Nix left the Maxwell home and walked down an adjacent alleyway. After having gone only several hundred feet they sighted the plaintiff's brother Keith driving plaintiff's automobile into the opposite entrance to the alleyway. Assuming that Keith was searching for plaintiff, the three boys attempted to elude plaintiff's brother by running through an adjacent used car lot and across the fronting street, Nolensville Road. Plaintiff ran into a vacant lot on the opposite side (east side) of Nolensville Road. The lot was partially covered with gravel and with weeds and bushes as high as three feet. Plaintiff's two friends had remained on the fringe area of the vacant lot next to the sidewalk fronting Nolensville Road. They called to plaintiff to come where they were located. Plaintiff testified that he then heard someone else shout, and then he heard a gunshot and a bullet "whizzing" through the weeds near him. He began to run back toward Nolensville Road and his companions when he heard a second gunshot. He fell to the ground and attempted to get up and run again but his right leg "locked up" on him. He testified that he heard a third shot "whiz" by him in the weeds.[2] Plaintiff testified that he did not see a policeman or hear anyone shout "halt" or "stop," prior to this time. He testified that a policeman, the defendant in this action, then ran into the brush with his gun pointed at plaintiff and told him to come out, with the plaintiff replying that defendant had shot him. The officer then asked him, "What are you doing?", to which plaintiff responded that he was "running from his older brother." According to plaintiff, defendant responded, "You lying 's.o.b.', you had better come up with something better than that." Plaintiff testified that he was then experiencing a "burning" sensation in his right leg and he again told defendant that he had shot him.

Immediately thereafter, Ruby Aldridge, the plaintiff's mother, Michael and Keith Aldridge, his two brothers, and Mr. Norman Maxwell, Mr. James Maxwell and Mr. Wayne Maxwell arrived on the scene. Plaintiff told his mother and brother Keith that he had been shot, and defendant then stated that plaintiff had probably injured himself by falling on a rock while running in the vacant lot. Defendant denied that he had "hit him" with a bullet. Plaintiff's mother attempted to pull up the plaintiff's right pant leg in order to look at the injury; however, the plaintiff, who was wearing tight-legged jeans, was unable to withstand the attendant pain. Plaintiff, his mother, and his brother Keith testified that blood was plainly visible on plaintiff's right pants leg and on the top of his shoe. Defendant and the other officer, D. E. Stephens, testified that defendant pulled the plaintiff's pants leg up above the right knee and saw no evidence of blood or any injury. Plaintiff, his mother and his brother Keith testified that plaintiff was unable to walk from the scene, but instead, his brother picked him up in plaintiff's automobile and carried him home where the wound was exposed and cleaned. Both officers testified that plaintiff walked away from the scene.

Plaintiff's father was called home from work, at which time he took plain-

---

dent which gave rise to this action. The deadly weapon which the plaintiff possessed during the commission of the armed robbery was a shotgun.

2. Plaintiff testified that he heard three gunshots, whereas most of the other witnesses testified that they heard only two shots.

tiff to the hospital. At approximately 1:30 a. m. on October 1, 1970, plaintiff was examined in a hospital emergency room. A surgical operation was performed on plaintiff between 2:40 a. m. and 4:10 a. m., resulting in the removal from his right knee joint of a "metallic fragment," smaller metal fragments, and loose fragments of bone. The lateral meniscus, i. e., the lateral cartilage of the knee joint, was also removed. The bullet had entered the plaintiff's leg several inches below the knee and traveled a course into the knee joint. The course of the bullet was consistent with plaintiff's testimony that he was running when the bullet struck him. His leg was evidently in a "flexed" position when the bullet entered it. The larger metallic fragment removed from plaintiff's leg was later identified to be a .38 special caliber cartridge.

Plaintiff remained hospitalized for five days and was required to wear a cast upon his right leg in order to keep it immobilized. After subsequent examinations and treatment, the treating physician has concluded that plaintiff will retain "a permanent physical impairment of the lower limb as a whole of approximately 20 to 25 percent." (Dr. Laughlin deposition, p. 10). Dr. Laughlin stated that plaintiff may suffer further due to "the wearing out of the knee joint in the future as a result of the damage to the articular surface of the joint," which could result in the loss of some motion. He explained that "the initial process is one of thinning or wearing out of the cartilage, followed by the loss of joint motion." (Dr. Laughlin deposition, p. 11)

## B. Defendant's Version

Defendant testified to the following account of the incident, this account being substantially corroborated to by his partner, Patrolman D. E. Stephens.

The defendant and Patrolman Stephens parked their patrol car in a parking lot and driveway in front of and between an office building and the Star City Discount Store on the east side of Nolensville Road. The officers got out of the patrol car to stretch their legs and stepped to the side of the car. They heard voices coming from the direction of the office building behind them. They saw two men running north across the parking lot from the direction of the office building toward the Star City Discount Store. Defendant called for them to stop, but they failed to do so. Defendant pulled his weapon and fired it twice into the air. The two individuals continued to run and went behind the Star City Discount Store. A third person, the plaintiff, then came out of the adjoining vacant lot and said that he had fallen and injured his "ankle." Defendant had plaintiff pull his right pants leg up above the knee, and saw no blood or injury of any kind. Thereafter, defendant questioned plaintiff as to any knowledge he had of the identity of the two fleeing individuals. Plaintiff denied knowing anything about them. The boy then walked home without assistance, although he did walk with a slight limp. Defendant testified that plaintiff's mother thanked the officers for finding her son. According to defendant, the officers made no effort to find the two individuals that they saw run behind the Star City Discount Store. The officers made no further investigation to ascertain whether a burglary or any other crime had taken place in that area on that night.

## C. Additional Testimony

A ballistics and firearms expert testified that the projectile (commonly referred to as a "slug") removed from plaintiff's right knee joint was a copper-colored bullet from a .38 special caliber cartridge, made by Western Manufacturing. The fragment was too mutilated and deteriorated for the expert to make a comparison with other bullets to ascertain the specific weapon from which the bullet had been fired. He testified that, in his opinion, the bullet was originally a standard 158 grain projectile which now weighed a little more than 152 grains. It was his opinion

that the bullet was probably not a 200 grain projectile originally because it did not evidence that much deterioration.

Defendant placed much emphasis on the testimony of the ballistics expert that the slug taken from plaintiff's leg was too small to be a 200 grain projectile. However, the treating physician's testimony that a number of metal fragments were removed from plaintiff's leg tends to negate the expert's opinion that the bullet was originally only a 158 grain projectile.[3]

Captain James A. York, Director of Training for the Metropolitan Nashville Police Department, testified that the police department ceased to issue 200 grain cartridges in June, 1968. At that time the department recalled all of the outstanding 200 grain .38 special caliber ammunition and exchanged it for 110 grain Super Vel .38 caliber ammunition. According to York, each police officer is required to carry 18 rounds of department-issued ammunition, and to file reports of any rounds which are discharged. Additionally officers are required to use only department-issued ammunition in their official weapons. York further testified that the department did "authorize the use" of .38 special caliber 158 grain ammunition prior to 1960.

## FINDINGS OF FACT

After reviewing the testimony of the witnesses, their personal interests, and their demeanor while on the witness stand, and after reviewing the exhibits submitted into evidence, the court holds that defendant violated certain civil rights of the plaintiff, and that plaintiff is entitled to recover under 42 U.S.C. § 1983. Based upon the following reasons, the court concludes that defendant's testimony was inconsistent and unreasonable in light of all of the testimony which was put into evidence.

1. All of the witnesses agreed that, except for Officer D. E. Stephens, no one else but the defendant had a weapon during the incident in question. All witnesses agreed that Stephens did not remove his pistol from its holster during the incident in question. Stephens tended the patrol car and did not talk to the plaintiff or anyone at the scene.

2. Several of plaintiff's neighbors testified that they heard no other gunshots during the evening after plaintiff left the company of the defendant officer.

3. Defendant responded to a pretrial interrogatory filed by plaintiff, by stating that plaintiff made the statement at the scene of the incident that "he had fallen and hurt himself. I asked him to pull his pants leg up, and looked and saw no wound or blood. He later said it was his *ankle* that had been hurt." (Mullins, Answer to Interrogatories, at 3.) (Emphasis supplied.) Also, on the witness stand defendant specifically testified that plaintiff complained of injuring his *"ankle."*

" . . . [W]e was all standing there in front of the car, and he [the plaintiff] was complaining about his ankle hurting, so I insisted he pull his breeches leg up, and he did. He pulled his pants leg up, he had on blue jeans. He pulled them up above his *knee*, and I looked at his leg. There was no wound on his leg, and there was no blood on his leg." (Emphasis supplied.)

On cross-examination defendant was adamant in his assertion that plaintiff complained of an injury to his "ankle." Defendant, in fact, corrected what seemed to be a slip of the tongue when he said "knee" by quickly clarifying his meaning to be "ankle." However, in Field Form # 108, the incident report which defendant filed with the police department the day after the incident, de-

---

3. No evidence was introduced that the expert had an opportunity to inspect these additional fragments and they were not offered into evidence; in fact, there was no evidence introduced that all of the fragments were removed from plaintiff's leg.

fendant wrote that the boy complained of injuring his "knee." (Defendant's Exhibit E). Additionally, on cross-examination defendant stated that although the boy only complained of injuring his ankle, he requested that the plaintiff expose his right leg by lifting his pants leg up above the knee.

4. Defendant testified that no attempt was made to locate the two individuals who ran from the scene. However, Officer Stephens testified that the two officers stayed within the "immediate area" and made a "windshield inspection" for the two suspects.

5. Captain York testified that when a weapon is used by an officer, the department *requires* the officer to file a report "no later than the end of his shift." Such a report is required to state the facts of the incident, the specific force used, and a statement of what ammunition was used. Defendant testified that he did not file a report in this case immediately after the end of his work shift because such reports could be submitted at the beginning of the next day's shift. Plaintiff filed a report about the incident in question, Field Form # 108, during the early hours of the following morning after a superior officer had gone to defendant's residence between 3:00 a. m. and 4:00 a. m. and instructed him to go to police headquarters and file the required report. The superior officer ordered defendant to do so after the police department received a complaint from plaintiff's parents.

6. Although defendant used a deadly weapon in attempting to stop suspected felons, neither he nor Officer Stephens made any further investigation to determine whether a crime had been committed in the area.

7. Although police records were available, no records were introduced to show the kind and the amount of ammunition defendant requisitioned after the incident in question. Such records of ammunition requisitioned, being available to defendant and in the custody and control of defendant's employer, would have constituted the best evidence of the ammunition requisitioned by defendant.[4]

8. Defendant, a policeman for eighteen years, testified that he did not recall ever having received any instruction as to the situations in which a police officer may use his weapon. When questioned about this on the witness stand, defendant testified as follows:

"Q. From your personal knowledge, Officer Mullins, what instructions have been given to you by the Metropolitan Police Department about firing your weapon at either fleeing felons or at suspects?

"A. I don't think any instructions have been given to me at all.

"Q. Did you undertake the course that Captain York gave? Did you complete that course?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Do you remember Captain York giving, or anybody on his staff giving instructions about when to fire your weapons, under what circumstances?

"A. No, sir.

"Q. How long have you been on the police department, Officer Mullins?

"A. Eighteen years.

"Q. Now, during those 18 years have you ever, by anyone, been instructed about firing your pistol in the general direction of suspects?

"A. Well, you don't fire your pistol or any type gun at any person unless he is trying to harm you or he is in a building and he is trying to get away."

Captain York testified that his training personnel instructed the members of the Metropolitan police force as to the use of their weapons and that such in-

---

4. According to Captain York's testimony, such evidence would have consisted of a card filled out by the police chief's secretary which approved such a requisition of replacement ammunition.

formation is also embodied in a department regulation. Mullins testified that he has taken target practice only twice during his eighteen years of service on the police force. One of those times occurred during a training program conducted by York's staff in 1968 when the .38 caliber Super Vel ammunition was issued. York testified that officers are not required to take target practice "except at stated intervals when we have in-service training programs." Although no evidence was introduced as to how often the "stated intervals" occur, it seems unreasonable that there was only one, in addition to 1968, during the past eighteen years.

Mullins further testified that he does not own a weapon personally and has never purchased, during the past eighteen years, any kind of ammunition for his pistol, which is in his possession twenty-four hours a day. Nor, he stated, has he ever been given any other than that issued by the department.

The court concludes that the testimony of defendant is at variance with the preponderance of the evidence presented at the trial.

## CONCLUSIONS OF LAW

Section 1983 of Title 42 of the United States Code reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ Defendant maintains that the defendant's conduct did not take place "under color of law" as required by 42 U.S.C. § 1983. "Under color of law" has been interpreted by the United States Supreme Court as follows:

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1940); Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1950); see also, Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961).

Defendant's argument seems to be based on the assertion that because defendant allegedly fired two warning shots into the air in an attempt to halt third parties, his conduct was not directed at plaintiff.

The court finds that the defendant did act directly toward plaintiff by pointing his weapon at him and discharging two rounds of ammunition at the plaintiff's person, one of which struck the plaintiff in the right leg.

In addition to using a deadly weapon in the performance of his duties, defendant clearly imposed his authority as a policeman on plaintiff when examining plaintiff as to his knowledge of the fleeing individuals. Defendant restrained plaintiff with a drawn weapon and required the plaintiff to expose his leg in order to inspect it for injury. All of these actions were done by defendant "under color of law." Without the authority to act, as provided by state law, the defendant would not have been allowed to lawfully carry a deadly weapon with the intent of going armed. T.C.A. § 39–4902. As stated by the Honorable Bailey Brown, "A person making an arrest is acting under color of law if, and perhaps only if, he is in fact acting as a public officer." Bryant v. Donnell, 239 F.Supp. 681, 686 (W.D.Tenn.1965).

Contrary to the averment of the defendant, this court finds that the defendant did act in the performance of his official duties when he shot the plaintiff, and that he was not merely acting in the "ambit of his personal pursuit." (Defendant's Trial Brief, at 3.)

■ Defendant clearly misused the power which he possessed by virtue of state law. According to the facts in the present case, the defendant shot plaintiff in the right leg without any legally sufficient justification.

" . . . an officer may shoot or even kill a felon, if that is the only means of taking him or preventing his escape; yet in so doing the officer acts at his peril, for a jury may find that there was no reasonable necessity for the killing and that he is guilty of at least a misdemeanor." State v. Dunn, 39 Tenn.App. 190, 282 S.W.2d 203, 206 (1943).

According to the testimony of both officers, at the time Mullins chose to use a deadly weapon in order to stop persons he suspected to be "fleeing felons," he did not know whether or not there was probable cause justifying an arrest. The two individuals were not seen in nor coming out of the office building; they were only seen running "from the direction of the office building." Additionally, neither suspect was seen carrying any package or item. Mullins was asked, "If you had been able to apprehend these other two individuals, what would they have been charged with?" Mullins replied, "They wouldn't have been charged with anything if they hadn't did anything."

Even by considering the facts and circumstances which confronted the defendant most favorably in his behalf, the court cannot find any probable cause which justified the use of deadly force to conduct an investigation. Mullins shooting his weapon under these circumstances was entirely unjustified and without warrant in law. *See,* McDaniel v. Carroll, 457 F.2d 968 (6th Cir., 1972).

"If there is shown to be present, on the part of the officers engaged in duties entrusted to them, malice, oppression, or wanton disregard of the rights of an individual citizen, Goodwin v. Guild (1895), 94 Tenn. 486, 29 S.W. 721, the officer is accountable in damages to the citizen for the consequences of his [the officer's] wrongdoing. Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed. 2d 605 (1963). The individual citizen is protected by the Federal Constitution and statutes enacted pursuant thereto, further, from unlawful administration of a state statute or municipal ordinance by officers, whether statewide or local, if there is in such official action of the policeman an element of intentional or purposeful discrimination." Ellenburg v. Shepherd, 304 F.Supp. 1059, 1062 (E.D.Tenn. 1966).

■ Speaking of the nature of the federal remedy provided by the civil rights statutes, the United States Supreme Court stated: "The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Monroe v. Pape, *supra,* at 183. A private citizen, who has been assaulted by a police officer, can state a claim for relief under the Civil Rights Act, 42 U.S.C. § 1983, citing Monroe v. Pape, *supra.* Cullum v. California Department of Corrections, 267 F.Supp. 524, 525 (N.D.Cal.1967).

Defendant asserts:

"By virtue of his status as a police officer, he is necessarily permitted the exercise of reasonable discretion, for which he is not liable in the conduct of his official activities, and as a police officer he is and must be endowed with privileges not accorded to ordinary citizens. Whirl v. Kern, 407 F.2d 781, 791 (1969), citing Pierson v. Ray, 386 U.S. 547, 555 [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967). The Defendant submits that he acted only in good faith and within the bounds of his privilege as a police officer when he fired his weapon and that this constitutes a defense to any claim that he deprived Plaintiff of any constitutionally guaranteed rights.

"It is understood that the protections from liability enjoyed by a police officer in the performance of his du-

ties is no grant of absolute immunity. But the Defendant contends that absent a strong showing of malice, oppression, or wanton disregard of the rights of the Plaintiff, the Defendant is not accountable in any way to Plaintiff for the consequences of his actions. Ellenburg v. Shepard, 304 F.Supp. 1059, 1062 (1969)." (Defendant's Trial Brief, at 5.)

This court finds that the defendant did act with wanton disregard of plaintiff's civil rights.

"In arresting for felony, a peace officer or even a private person, acting without a warrant, may, if necessary, kill a felon after he resists or flees, so that he cannot otherwise be taken; but the law does not clothe an officer or private person with authority to arbitrarily judge the necessity of killing, and such a course must be the last resort; and whether or not there was a necessity for killing, and the reasonableness of the grounds upon which the officer or the private person acted, are questions of fact for the jury. [Citations contained therein.]

". . . the rule to be observed in a civilized state, . . . is . . . that neither an officer nor a private person can slay to arrest the nonresisting flight of a felon if he can be otherwise taken. Killing in flight is excusable only when it is shown that the felon cannot be ultimately taken by less drastic means, and that presents a question for determination by the jury." Scarbrough v. State, 168 Tenn. 106, 76 S.W.2d 106, 107 (1934). See also, Love v. Bass, 145 Tenn. 522, 238 S.W. 94, 96 (1922).

As the fact finder in this case, the court finds that under the facts and circumstances of the case, defendant was unwarranted in using a deadly weapon to investigate a suspected burglary.

■ As in an ordinary tort case, a defendant is liable for the natural consequences of his acts in a § 1983 civil rights case so long as his conduct is done "under color of law" and deprives the plaintiff of a civil right. Daniels v. Van De Center, 382 F.2d 29, 31 (10th Cir. 1967); Monroe v. Pape, supra, at 187.

"If the thing done produces immediate danger of injury, it is not necessary that the author of it should have in mind all the results which might happen from the danger, or that he could foresee the particular one which did happen. Nor does it matter that other forces combined with his act to produce that result." (Citations contained therein.) State v. Dunn, supra, 282 S.W.2d at 208.

■ At the very least the defendant's conduct constituted "gross negligence" which is subject to protection under § 1983. Jenkins v. Averett, 424 F.2d 1228 (4th Cir. 1970).

Defendant was grossly negligent when he made the decision to use a deadly weapon in order to carry out an investigation of merely suspicious circumstances.

■ The court further finds that at the time the defendant acted, he knew, or as a reasonable man should have known, that his acts were ones which would deprive plaintiff of his constitutional rights or might lead to that result. No specific intent to deprive a person of a federal right is necessary for a § 1983 action. Jenkins v. Averett, supra, at 1232; Baxter v. Birkins, 311 F.Supp. 222, 225 (D.Colo.1970).

■ Defendant raises the defense that the use of force by an officer acting in good faith belief that he has such authority is a valid defense to a § 1983 action. See, e. g., Gabbard v. Rose, 359 F.2d 182, 185 (6th Cir. 1966). In the case of Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court held that the defense of good faith and probable cause, which is available to a police officer in a common law action for false arrest and false imprisonment, is also available to him in an action under 42 U.S.C. § 1983. This court is unable to find any authority which recognizes such a defense when the cause of action

is based upon an assault and battery rather than false imprisonment, false arrest, or malicious prosecution. *See, e. g.,* Stringer v. Dilger, 313 F.2d 536, 540 (10th Cir. 1963).

 Even assuming the validity of the good faith defense in a § 1983 action, the defendant did not offer any evidence which supports a conclusion that he did, in fact, act in good faith. Instead, the evidence shows that the defendant did not know if the plaintiff or the two fleeing suspects had committed any crime, nor did defendant have any evidence justifying any suspicion on his part other than the individuals running and failing to stop. The defendant had no knowledge of the commission of any felony, nor did he observe the individuals in the building or carrying away any items in their hands. Defendant presented no evidence which proved that he had any legal justification to shoot at plaintiff or that he acted in good faith.[5]

The unreasonable use of force, even by an *arresting* officer, constitutes a denial of due process of law. Beyer v. Werner, 299 F.Supp. 967 (E.D.N.Y. 1969); Arroyo v. Walsh, 317 F.Supp. 869 (D.Conn.1970).

If an officer commits a § 1983 violation by arresting a person unlawfully due to the absence of a warrant and absence of probable cause to believe that the person *arrested* had committed or was committing an offense, Ellenburg v. Shepherd, 304 F.Supp. 1059 (E.D.Tenn. 1966), aff'd. 406 F.2d 1331 (6th Cir. 1968), cert. denied 393 U.S. 1087, 89 S. Ct. 878, 21 L.Ed.2d 781 (1969), then an officer is also liable for committing a § 1983 violation when he uses deadly force without probable cause to conduct an investigation.

This court holds that plaintiff is entitled to recover Ten Thousand Dol-

lars ($10,000.00) in compensatory damages and Three Thousand Dollars ($3,000.00) in punitive damages against the defendant.[6] After reviewing the facts in the present record, the court does not find sufficient evidence to justify awarding attorneys' fees to the plaintiff.

---

5. No definition of "good faith" has been found by the court which has been used in a § 1983 case or in a tort action against a police officer; therefore, the court applied a general definition of "good faith" to the facts in the present case, e.g., "honesty of

intention." Siano v. Helvering, 13 F.Supp. 776, 780 (D.N.J.1936).

6. Authority for allowing the finder of fact to award punitive damages in Tennessee and in federal § 1983 cases is found in McDaniel v. Carroll, *supra.*