**Minerva RIVERA, individually and on behalf of her minor children and on behalf of all others similarly situated, Plaintiffs,**

v.

**Daniel DUNN, Director of Welfare, City of New Haven, and Henry C. White, Commissioner of Welfare, State of Connecticut, Defendants.**

**Civ. No. 14517.**

United States District Court, D. Connecticut.

July 29, 1971.

David M. Lesser, William H. Clendenen, Jr., Stuart Bear, New Haven, Conn., for plaintiffs; John M. Creane, Bridgeport, Conn., of counsel for intervening plaintiffs.

James M. Higgins, Asst. Atty. Gen., Francis J. MacGregor, Asst. Atty. Gen., East Hartford, Conn. (Thomas F. Keyes, Jr., Stephen G. Friedler, New Haven Conn., of counsel), for defendants.

Before SMITH, Circuit Judge, and CLARIE and ZAMPANO, District Judges.

## MEMORANDUM OF DECISION

J. JOSEPH SMITH, Circuit Judge:

This action was brought in the United States District Court for the District of Connecticut seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 striking down as unconstitutional a statute recently enacted by the legislature of Connecticut requiring persons receiving public assistance to have been residents of the state for at least one

year.[1]  The plaintiffs also seek a permanent injunction against the statute's enforcement and the payment of funds unconstitutionally withheld.

On July 16, 1971 a temporary restraining order was entered by the district court enjoining the continued enforcement of the statute.  This three-judge court was then convened by the Chief Judge of this circuit pursuant to 28 U.S.C. §§ 2281 and 2284.  The plaintiffs have moved that this action proceed as a class action in accordance with Rule 23(a), Federal Rules of Civil Procedure, with the plaintiffs representing a class composed of all persons eligible for the receipt of public assistance except for their failure to meet the one-year residency requirement.  The defendants have concurred in this motion, and the court therefore designates this as an appropriate class.

The members of this court are not unfamiliar with the issues raised by this case since two of its present members sat on the three-judge district court which invalidated a Connecticut statute virtually identical with that at issue here.  [Thompson v. Shapiro, 270 F. Supp. 331 (D.Conn.1967)]  The decision of that court was, of course, affirmed by the Supreme Court in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L. Ed.2d 600 (1968), and Mr. Justice Brennan's opinion for the Court in that case is dispositive here.

The Court based its opinion in *Shapiro* squarely on the previously established right of citizens of the United States to travel between the several states "uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."[2]  The Court reviewed the long line of cases which established this right beginning with the Passenger Cases, [Smith v. Turner, Norris v. Boston] 7 How. 283, 492, 12 L.Ed. 702 (1849), and quoted with approval Mr. Justice Stewart's statement for the Court in United States v. Guest, 383 U. S. 745, 757–758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966):

> The constitutional right to travel from one State to another  *  *  *  occupies a position fundamental to the concept of our Federal Union.  It is a right that has been firmly established and repeatedly recognized.  *  *  * [T]hat right finds no explicit mention in the Constitution.  The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.  In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution.

Since the Court found that the residency requirement acted to impede a "fundamental" right, its constitutionality would not be measured by the "rational connection" test usually employed for equal protection purposes.  As the Court pointed out, the waiting period requirement based on classification by length of residence, touching as it does on a fundamental right of interstate movement,

1.  House Bill No. 9508, Special Act No. 1, June Session 1971 Section 15:

Notwithstanding any other provision of law, and to the extent compatible with federal requirements for reimbursement to the state for its public assistance program, no payment for public assistance and care under chapter 302 of the general statutes, as amended, or for general assistance under part I of chapter 308 of the general statutes, as amended, shall be made to any person applying therefor after the effective date of this act and during a period of five years thereafter, which applicant has not been a resident of this state for a period of one year next preceding such application; except that, upon application making a showing of need, the welfare commissioner may furnish a person not entitled to assistance and care under this act with temporary aid or care and transportation and attendant expenses to another state or country, provided such person has resided therein during the past twelve months or has legally responsible relatives therein or friends willing to undertake the obligation to support him.

2.  Shapiro v. Thompson, 394 U.S. 618 at 629, 89 S.Ct. 1322 at 1329.

clearly violates the Equal Protection Clause of the first section of the Fourteenth Amendment.[3]

> The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize that right, unless shown to promote a *compelling* governmental interest, is unconstitutional. [394 U.S. at 634, 89 S.Ct. at 1331 (emphasis in original)]

Whether reduction in benefits to all may result from furnishing aid to all, or whether the state can or should raise additional funds, or cut the level of assistance still further are questions for the governor and legislature. The state cannot, however, ignore the Constitution and the Supreme Court's decision in Shapiro v. Thompson, and alleviate its problems by an arbitrary discrimination against some of its people resident in the state by classification on the basis of length of residence.

Since the Court decided *Shapiro,* the lower courts have uniformly struck down all manner of attempts to establish durational residency requirements for state and local welfare.[4] Only recently the Supreme Court in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), (June 14, 1971) (Blackmun, J.) reaffirmed its continued adherence to the principles set forth in *Shapiro* in invalidating statutes which conditioned an alien's welfare eligibility upon his length of residence in this country.

> Since an alien as well as a citizen is a "person" for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in *Shapiro.*

The State of Connecticut attempts to argue, however, that there now exists a sufficiently compelling state interest to justify the minimum residency requirement in spite of its effect on constitutionally protected rights. The statute includes a long preamble which is here set forth in the margin in which the legislature explained why it felt such a compelling interest to exist.[5]

---

3. Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

4. Alvarado v. Dunn, No. 12399 (D.Conn. 1968); Green v. Dept. of Public Welfare, 270 F.Supp. 173 (D.Del.1967); Harrell v. Tobriner, 279 F.Supp. 22 (D.D.C. 1967), aff'd, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Burns v. Montgomery, 299 F. Supp. 1002 (N.D.Cal.1968), aff'd, 394 U.S. 848, 89 S.Ct. 1623, 23 L.Ed.2d 31 (1969); Ramos v. Health and Social Services Board, 276 F.Supp. 474 (E.D. Wis.1967); Denny v. Health and Social Services Board, 285 F.Supp. 526 (E.D. Wis.1968); Robertson v. Ott, 284 F. Supp. 735 (D.Mass.1968); Bryson v.

Burson, 308 F.Supp. 1170 (N.D.Ga. 1969); Baxter v. Birkins, 311 F.Supp. 222 (D.Colo.1970); Barnett v. Lindsay, 319 F.Supp. 610 (D.Utah 1970); Arnold v. Halifax Hospital Dist., 314 F.Supp. 277 (M.D.Fla.1970); Crapps v. Duval County Hospital, 314 F.Supp. 181 (M.D. Fla.1970); Major v. Van DeWalle, F. Supp. (N.D.Ind.1969); Sheard v. Department of Social Welfare, 310 F.Supp. 544 (N.D.Iowa 1969); Gaddis v. Wyman, 304 F.Supp. 717 (S.D.N.Y.1969), aff'd, Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970).

5. House Bill No. 9508, Special Act No. 1, June Session 1971 Section 14:

The state of the economy in Connecticut and elsewhere is one of severe stringency. The combination of inflation and high unemployment undermines the capacity of governments at all levels to meet the need for public services and to deal effectively with growing social problems, as well as the capacity of individual citizens to provide for their own needs. The challenges facing the state and local governments today are

manifold and are particularly acute in our urban areas. Many people are living in seriously overcrowded housing and under substandard conditions. The housing shortage is acute and rapidly becoming worse. Narcotics addiction and other forms of drug abuse have reached epidemic proportions. In many urban areas, schools, social services and health resources are seriously overburdened. Crime, dirty streets and pollution also plague our cities. Essential public services, including fire and police protection, sanitation and education, are simply becoming severely overloaded. The growth in the welfare burden during this time of inflation and a tightening job market heightens these problems both by increasing the demand for other essential services and by necessitating a diversion of limited funds from them. It has been a consistent state policy to provide for the sustenance of all those persons unable to provide for themselves. The state has realistically determined the minimum needs of sustenance in Connecticut. At the same time that dollar costs have spiraled upwards, a corresponding pattern has developed for the number of persons on welfare. In view of increasing welfare costs the state governments cannot continue to finance the escalating costs of providing the educational, health and other services needed to meet the varied problems they face.

Inflation and the rapid growth in the cost of providing basic public services have resulted in high state and local tax burden. The additional tax effort necessary to meet the projected financial requirements of welfare would only accelerate the flight of job producing and revenue producing business thereby further undermining the capacity of governments in this state to meet their responsibilities. The welfare problem is one result of the federal government's failure to return adequate revenues to the states on an equitable basis. Despite the magnitude of the welfare problem in Connecticut and despite our major effort to meet that burden, this state has received the lowest possible percentage of federal assistance of those states providing full service. The rate of federal aid for welfare is not related to the amount paid by states to persons in need, nor to the percentage of such persons who reside in such states, nor to the maintenance of effort by such states as demonstrated their willingness to tax their residents to support their assistance programs, nor to the extension of such assistance to needy persons not included within the categories of federal public assistance. A significant proportion of the state's public assistance load, in terms of the numbers of recipients and the level of expenditures, is directly attributable to the national inequality of public assistance payments. Since Connecticut has provided sufficient living allowances for needy persons and other states have not, there has been and continues to be a significant migration of persons from those states into Connecticut as the direct result of lack of welfare assistance and services provided by the states from which they came. The continued growth in the number of persons in need of public assistance threatens the capacity of state and local goverments to continue to provide and finance adequate levels of all public services, including public assistance, for those residents here as well as those coming into the state. Reductions in public assistance allowances will clearly be necessary in the immediate future unless the rate of increase in the number of recipients substantially abates.

For persons unable to provide for themselves to come to Connecticut from throughout the nation, is, therefore, unfair both to those who live here as well as to those who would seek to come here at this time and under these circumstances. The greatest public good and least public harm will come from the maintenance of the levels of public assistance rather than from the stretching of this state's limited state and local funds to cover persons who have not yet established dependence upon them—those who are the most recent arrivals in the state. To provide for the needs of all persons in the state, the legislature finds the establishment of a five-year emergency period during which the state will require a one-year residency as an essential step in protecting the state's economic and social viability. In 1964–65, our net welfare expenditures were close to $76 million. By 1969–70, they mushroomed to almost $197 million, and from July of 1970 to May of this year, they jumped again, alarmingly, to almost $219 million. Among the significant contributory elements in this spiraling cost, one example, the largest single element, is the category of aid to adults and dependent children, which during these same comparative periods has jumped from $25 million to $67 million to $77 million, supporting 16,000 adults and 43,000

It appears from the testimony that applications for public assistance are made initially to local welfare departments, which may grant general assistance pending action on applications for state assistance in the categories eligible for such assistance. The state reimburses the local government for 90% of aid furnished.

· Testimony based on a pre-audit of the records of welfare departments of the 8 towns of the 169 towns of the state which account for 82% of the welfare cases in the state was to the effect that approximately 17.6% of recent applicants had resided in the state less than one year. The pre-audit report itself was not produced, its makers were not subject to examination, and its weight is questionable. No showing was made that the percentage of *recipients* of aid would include any such percentage if the residency requirement were removed. Their reasons for coming to the state, whether to seek or accept employment, to be near relatives or friends, or to seek public relief or better accommodations were not developed. No showing was made by the state as to the effect of reverse migration, that is, the number or percentage of persons assisted who leave the rolls because of removal of residence to another state or commonwealth, claimed by plaintiffs to be of the order of 25% of discontinuances. Of course, a rise in relief case loads was testified to by the New Haven and Waterbury officials. This indicates that new cases, whether from increase in unemployment, disability, immigration or other causes, exceeds the number of discontinuances. But even if the pre-audit testimony be taken in the most favorable light to the state, it is insufficient.

The legislature, at the urging of the present Welfare Commissioner, followed the lead and essentially adopted the language of the New York legislature in attempting to justify the one-year residence requirement. The legislature also ended the open-end budget for welfare, budgeting specific amounts with a limited power in the Commissioner to lower or raise the level of aid to those on public assistance. We are told that if the one-year residency is found invalid, it will be necessary for the Commissioner to reduce the level of aid for all. In addition, an overall 11½% cut in budgeted expenditures apparently by executive order of the governor, will require an additional reduction in welfare expenditures. It is, of course, quite true as the legislature noted that the demands on state and local governments are increasing at a substantial rate while the financial resources available to meet these needs have failed to keep pace.[6] The Supreme Court, however, has made it quite clear that conservation of the public fisc is not a sufficient ground to authorize a residency statute which also has the effect of limiting the right of certain citizens to travel freely throughout the United States.

We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance,

children in 1965, 22,000 adults and 67,000 children in 1970, and now jumping again, as of April of this year, to 26,000 adults and 78,000 children—over 100,000 people. We spent $7½ million on this program in May of this year, almost $77 million in fiscal 1971, as compared with $67 million in fiscal 1970, for a total of almost $145 million in this biennium to date. Our total welfare expenditures were almost $21 million in May of this year, $219 million for eleven months of the current fiscal year—almost $197 million for fiscal 1970, and a total of almost $416 million for this biennium to date. Considering a current state operating deficit of $260 million, and welfare costs approaching half a billion, a fiscal crisis of inordinate proportion must be met.

6. The federal government presently reimburses the states for some 50% of the budgeted relief expenditures on which testimony was presented. Whether the federal proportion should be increased or indeed the entire burden placed on the federal taxpayer is, of course, presently being debated in the Congress.

public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification. [Shapiro v. Thompson, *supra*, at 633, 89 S. Ct. at 1330.]

The attempt to throw up state fences to bar movement of people grows from an understandable fear of runaway expenditure for relief. But it flies squarely in the face of the Constitution, which established the ideal of one nation and one people. The Fourteenth Amendment was adopted in the wake of the Civil War, fought to preserve the Union as one nation as well as to destroy the institution of slavery. The first section of the Amendment—which Connecticut was the first state to ratify on June 30, 1866—emphasizes the universality of American citizenship and prohibits a state from denying equal protection to its residents.

The State of Connecticut has presented no rationale other than economy to justify the statute in question.[7] Existing precedent, therefore, makes simple the disposition of this case. Section 15 of the statute is on its face unconstitutional. The defendants and their officers or agents are permanently enjoined from enforcing its one-year residency provisions and are directed to grant relief in normal course to those otherwise eligible. The foregoing may serve as the court's findings of fact and conclusions of law.

---

7. The legislative history of this statute is worth noting. It was introduced on June 5, 1971 as an amendment to proposed House Bill 6447 dealing with welfare burial expenses. [Journal of the House, 5 June 1971, p. 2229] Debate in the House occurred on June 7, 1971. [Journal of the House, 7 June 1971, pp. 2279–2283] The debates reveal that no committee hearings were held and no evidence was heard as to the effect of a residency requirement on the state's fiscal problems. Apparently a major impetus for the bill's passage was a fear of an influx of new indigents into the state because of the residency requirement which had been recently enacted in New York. [Proceedings of the House of Representatives, June 7, 1971, pp. 187–191, 195–197]