**Beverly Ann BESAW et al.**

**v.**

**John J. AFFLECK et al.**

**Civ. A. No. 4684.**

United States District Court,
D. Rhode Island.

Nov. 11, 1971.

John M. Roney and Cary J. Coen, of R. I. Legal Services, Inc., Providence, R. I., for plaintiffs.

W. Slater Allen, Jr., Asst. Atty. Gen., State of Rhode Island, Providence, R. I., for defendants.

Before McENTEE, Circuit Judge, PETTINE, Chief Judge, and DAY, District Judge.

## OPINION

PETTINE, Chief Judge.

This is a civil rights action authorized by 42 U.S.C. § 1983 and 28 U.S.C. § 2201 wherein plaintiffs seek to have this Court declare invalid and enjoin the enforcement of Chapter 290, 1971 Rhode Island Public Laws, which denies Public Assistance benefits to persons who have not resided in the State of Rhode Island for at least one (1) year. Jurisdiction of the Court is based on

28 U.S.C. § 1343(3); 28 U.S.C. § 1343 (4) and 28 U.S.C. § 1331.

Plaintiffs, individually and as representatives of a class, argue this restriction on welfare benefits abridges their constitutionally protected right to travel and is invalid under the Equal Protection Clause of the Fourteenth Amendment.

### Travel of the Case

The complaint was filed on August 2, 1971 and a temporary restraining order was entered that day enjoining the enforcement of the statute. Leave to proceed in forma pauperis was granted. This three-judge court was convened pursuant to 28 U.S.C. §§ 2281 and 2284 and the temporary restraining order continued in effect by operation of 28 U.S.C. § 2284(3). Plaintiffs have moved for summary judgment.

1. Statements of findings on which legislation is based that are contained in the challenged legislation may be considered by the Court. Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 239, 88 S.Ct. 1923, 20 L.Ed. 2d 1060 (1967).

2. "Chapter 290: Effective date 7/23/71 H 1881 Substitute 'A'
State of Rhode Island and Providence Plantations
JANUARY SESSION, A.D. 1971
AN ACT to Institute a Temporary Requirement of Residency for Eligibility for Assistance and Care During a Period of Emergency Which Threatens the Economic and Social Viability of the State.
Whereas, The state of the economy in Rhode Island and elsewhere is one of severe stringency. The combination of inflation and high unemployment undermines the capacity of governments at all levels to meet the need for public services and to deal effectively with growing social problems, as well as the capacity of individual citizens to provide for their own needs, and
Whereas, The challenges facing the state and local governments today are manifold and are particularly acute in our urban areas. Many people are living in seriously overcrowded housing and under substandard conditions. The housing shortage is acute and rapidly becoming worse. Narcotics addiction and other forms of drug abuse have reached epidemic

### Findings of Fact

This is a relatively simple task. The facts are undisputed and are as recited in the complaint, in the affidavits filed in support of the temporary restraining order and in a deposition of one of the defendants, John J. Affleck, Director of the Department of Social and Rehabilitative Services, who is charged with the administrative responsibility of this law under attack.

The 1971 Rhode Island Public Laws, Chapter 290 makes one year's residency in Rhode Island a prerequisite to eligibility for public assistance from the Rhode Island Department of Social and Rehabilitative Services.

The contested Act's statement of legislative findings and policy [1] details a legion of problems allegedly so prodigious as to " * * * Threaten[s] the Economic and Social Viability of the State." [2]

proportions. In many urban areas, schools, social services and health resources are seriously overburdened. Crime, dirty streets and pollution also plague our cities. Essential public services, including fire and police protection, sanitation and education, are simply becoming severely overloaded; and
Whereas, The growth in the welfare burden during this time of inflation and a tightening economic job market heightens these problems both by increasing the demand for other essential services and by necessitating a diversion of limited funds from them; and
Whereas, It has been a consistent state policy to provide for the sustenance of all those persons unable to provide for themselves. The state has realistically determined the minimum needs of sustenance in Rhode Island. In the face of continually increasing requirements of funds to meet these needs, both the state and local governments have continued to pay their shares.
The state of Rhode Island, although the smallest state in the United States, ranks sixth in the expenditure per capita for public assistance at approximately seventy-five ($75.) dollars per inhabitant per year for public assistance; and
Whereas, The state of Rhode Island is the second most urbanized state in the United States, thereby resulting in an acute housing shortage of overwhelming magnitude. Average rental payments

paid by or on behalf of public assistance recipients have been and are continuing to increase at a phenomenal rate, primarily due to the lack of low cost housing; and

Whereas, Although the state of Rhode Island is confronted with and in fact is in the midst of a severe budgetary crisis, expenditures for public assistance have increased by over one hundred (100%) per cent in three (3) years in that expenditures for subsistence and medical payments combined were $52,316,125.00 in fiscal year 1968 and in fiscal year 1971 such payments will total $113,400,000.00. During fiscal year 1972, the state of Rhode Island will be required to provide public assistance to over 100,000 people, or to more than ten (10%) per cent of the population of the state. At the time that these costs are and have been spiraling upwards, a corresponding pattern has developed for the increasing total number of people receiving public assistance; and

Whereas, The state government cannot continue to finance from its own revenues the escalating costs of providing the educational, fire, police, sanitation, health and other services needed to meet the varied problems it faces. Inflation and the rapid growth in the cost of providing basic public services have resulted in increasing tax burdens on its citizens. The additional taxes necessary to meet the projected financial requirements of welfare would only accelerate the flight of job producing and revenue producing business thereby further undermining the capacity of government in this state to meet its responsibilities. In recognition of the impact that additional taxes would have, the legislature has already imposed severe budgeting restrictions on all aspects of the operations of state government and on the levels of public assistance provided by the state; and

Whereas, The welfare problem is one result of the federal government's failure to return adequate revenues to the states on an equitable basis. The rate of federal aid for welfare is not related to the amounts paid by states to persons in need, nor to the percentage of such persons who reside in such states, nor to the maintenance of effort by such states as demonstrated in their willingness to tax their residents to support their assistance programs, nor to the extension of such assistance to needy persons not included within the categories of federal public assistance; and

Whereas, A significant proportion of the state's assistance load, in terms of the numbers of recipients and the level of expenditures, is directly attributable to the national inequality of public assistance payments. Since Rhode Island has provided sufficient living allowances for needy persons and other states have not, there has been and continues to be a significant migration of persons from those states into the state of Rhode Island as the direct result of lack of welfare assistance and services provided by the states from which they came. The continued growth in the number of persons in need of public assistance threatens the capacity of state government to continue to provide and finance adequate levels of all public services, including public assistance, for those residents here as well as those coming into the state. Even with the reduction this year of public services in every field and a substantial increase in taxes, it has been necessary, for the first time, to reduce the proportion of public assistance allowances below one hundred per cent of determined need. Further reductions will clearly be necessary in the immediate future unless the rate of increase in the number of such recipients substantially abates. For persons unable to provide for themselves to come to Rhode Island from throughout the nation is therefore unfair both to those who live here as well as to those who would seek to come here at this time and under these circumstances; and

Whereas, The greatest public good and least public harm will come from the maintenance of the levels of public assistance rather than from the stretching of this state's limited state funds to cover persons who have not yet established dependence upon them—those who are the most recent arrivals in the state. To provide for the needs of all persons in the state the legislature finds the establishment of a five-year emergency period during which the state will require a one-year residency as an essential step in protecting the state's economic and social viability, and in furtherance of the public health and welfare, now therefore, It is enacted by the General Assembly as follows:

Section 1. Notwithstanding any other provision of law, and for so long as the state shall not be disqualified from federal reimbursement for its public assistance program, no payment for public assistance and care of any kind shall be made to any person applying therefore after the effective date of this act and during a period of five years thereafter, to any applicant who has not been a resident of the state for the period of one year next preceding such application except

It finds that this threat is aggravated by the increase in welfare costs and its recipients, creating a "severe budgetary crisis" seriously threatening the State's ability to meet its medical, crime, educational and housing problems; that " * * The additional taxes necessary to meet the projected financial requirements of welfare would only accelerate the flight of job-producing and revenue-producing business, thereby further undermining the capacity of government in this state to meet its responsibilities," and in order to avoid these increases in taxes, the State has imposed severe restrictions on all governmental services, including public assistance.

■ The representative plaintiffs of the class[3] are Beverly Ann Besaw, a twenty-four year old mother of two who was pregnant at the time the complaint was filed, and Imogene Moore, a twenty-seven year old mother of three, also then pregnant.

The complained of constitutional violation is factually founded in the refusal of plaintiffs' applications for public assistance on behalf of themselves and their children under the program, jointly funded by the State and Federal Government, providing Aid to Families with Dependent Children, on the sole ground that they were ineligible for lack of residency in Rhode Island for one (1) year as required by Chapter 290.

*Motion for Summary Judgment*

■ Recognizing that caution is mandated in considering motions for summary judgment,[4] this Court concludes that the standards for issuance of summary judgment are here satisfied. All the facts necessary to resolve the legal issue are before the Court and there is no genuine issue of material fact. Accepting the legislative findings set forth in the Act's preamble as true, it is manifest that the Act's existence is predicated on economic factors. Such factors cannot show a compelling State interest which would justify infringement on the fundamental right to travel as enunciated in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600. Rivera v. Dunn, 329 F.Supp. 554 (D.Conn. 1971).

This legislation attempts to create two classes of needy residents, which are "indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction." *Shapiro, supra*, 394 U.S., at 627, 89 S.Ct., at 1327. The objective of the legislation is to deter poor people from entering the jurisdiction by denying them welfare benefits for the first year of their residency. This inhibition on the fundamental right of travel of indigents is constitutionally impermissible unless "shown

that upon application making a showing of need, the department of social and rehabilitative services may furnish a person not entitled to assistance and care under this act with transportation and attendant expenses to another state or country, provided that such person has resided therein during the past twelve months or has legally responsible relatives therein or friends willing to undertake the obligation to support him, and in such event, the expenditure shall be reimbursed to said department upon the submission of an account therefor and upon the audit and warrant of the comptroller.

Sec. 2. This act shall take effect upon its passage, and all acts or parts of acts inconsistent herewith are hereby repealed."

3. This suit is properly maintained as a class action. The class meets the requirements of Rule 23, Fed.R.Civ.P. and class relief is particularly appropriate here.

4. See United Meat Co. v. Reconstruction Finance Corp., 85 U.S.App.D.C. 9, 174 F.2d 528 at 531:
    "[This rule] should be cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of facts between them." We also recognize that the determination of a motion for summary judgment should find its genesis in a well developed factual record. Cf. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

to be necessary to promote a *compelling* governmental interest." *Shapiro, supra,* at 634, 89 S.Ct., at 1331. See, The Supreme Court: 1968 Term, 83 Harv.L. Rev. 118 (1969).

Emergencies in housing, medical facilities, unskilled employment, and educational facilities, stemming from a "budgetary crisis" that may demand increased taxes cannot be the justification for discouraging indigents from entering Rhode Island. *Rivera, supra.* It is clear this is constitutionally impermissible. The United States Supreme Court in *Shapiro, supra,* at pages 631–632, 89 S.Ct., at page 1330:

> "Thus, the purpose of deterring the in-migration of indigents * * * is constitutionally impermissible.
>
> \*   \*   \*   \*   \*   \*
>
> More fundamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not take this consideration into account. But we do not perceive why a mother who is seeking to make a new life for herself and her children should be regarded as less deserving because she considers, among other factors, the level of a State's public assistance. Surely such a mother is no less deserving than a mother who moves into a particular State in order to take advantage of its better educational facilities."

The Supreme Court spoke directly to the use of economic factors as justification at page 633, 89 S.Ct. at page 1330:

> " * * * [A] State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. * * * *The saving of welfare costs cannot justify an otherwise invidious classification.*" (emphasis added)

In an analogous case, the Supreme Court recently reaffirmed that economic justifications do not provide a compelling State interest under the Equal Protection Clause. In Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), a case involving an "inherently suspect classification," the Supreme Court invalidated two State statutes that denied welfare benefits to resident aliens or those lacking a specified number of years of residency in the United States as violative of the Equal Protection Clause. In *Graham,* the Court pointed out that in order to protect special interests of the State or its citizens, it had on occasion upheld State statutes treating citizens and non-citizens differently. It must be noted, however, this public interest doctrine " * * * was heavily grounded on the notion that '[W]hatever is a privilege rather than a right, may be made dependent upon citizenship.' "

> "But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' " (citations omitted)
>
> \*   \*   \*   \*   \*   \*
>
> "Since an alien as well as a citizen is a 'person' for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in *Shapiro.*"

*Graham, supra,* at 374, 375, 91 S.Ct., at 1853.

The United States Supreme Court has rejected, in the absence of a compelling State interest,[5] the conservation of the

---

5. As Judge Coffin noted in Cole v. Housing Authority of City of Newport, 435 F.2d 807 (1st Cir. 1970), the *Shapiro* court did not make clear what would constitute a compelling State interest:

"The Court spoke of the requisite impact in three ways. In discussing the purpose of the durational requirement,

public fisc as reason justifying a residency requirement impinging "on the fundamental right of interstate movement." *Shapiro, supra*, 394 U.S., at 638, 89 S.Ct., at 1333.

It might be noted that defendant Affleck's uncontradicted deposition raises doubts whether this legislation could pass the traditional and less restrictive "rational relationship" test for equal protection. See McDonald v. Board of Elections, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1968). Affleck's statement that this legislation was unnecessary and

would involve significant. additional administrative costs in implementing it [6] lends support to plaintiffs' argument that little or no economic benefit would accrue to the State.

The burden this legislation imposes on the poor, as opposed to the non-poor, for only the poor are concerned with access to public assistance, is of concern. Passage of this legislation, in the clear light of established caselaw condemning the constitutionality of such residency requirements [7] and evidence of its inutility as an economizing device, suggests the

---

it noted the deterrent effect on indigents desiring to migrate and resettle. 394 U.S. at 629, 89 S.Ct. 1322. Subsequently it focused on the post-moving penalizing effect. 394 U.S. at 634, 89 S.Ct. 1322. And finally, in capsuling its holding, it labelled the classification suspect because it 'touches on the fundamental right of interstate movement.' 394 U.S. at 638, 89 S.Ct. at 1333. That this quoted phrase is not to be taken literally is indicated by the Court's appended footnote 21, at 638, 89 S.Ct. 1322, which held open the possibility that some waiting period or residence requirements might serve a compelling interest or might not be penalties."
*Cole, supra,* at 809–810.
Defining " 'travel' in the sense of migration with intent to settle and abide," ibid. 811, thus disadvantaging those who travel for the mere purpose of taking advantage of the State benefits and leaving, Judge Coffin pointed out it would be permissible to require of applicants a bona fide intent to reside in the community. *Cole, supra,* at n. 11.
This limitation, of course, in no way vitalizes the defendants' position, for the record is simply starved of any itinerant label on these plaintiffs.

6. Defendant Affleck's deposition stated:
" * * * the study submitted to the Senate in response to their resolution. (a study made by the witness) That I didn't think it was necessary (that is the enactment of the statute) when one looks at the number of people that were involved, including the fact that substantial out-migration of people receiving assistance in Rhode Island occurs. In 1967, for example, in that study, more people left Rhode Island than came to Rhode Island who both were receiving assistance. Similarly, substantial, if memory serves, perhaps 129 or 30 families left Rhode Island

during the quarter studied who had been receiving assistance, and 171 came who had less than a year's residence at that point in time."
The report sent to the Senate by Mr. Affleck introduced and made part of his deposition shows that only 17.3 per cent of the applicants for public assistance have resided in Rhode Island for less than one year and that of these, 5.1 per cent were former Rhode Islanders.

7. *Residency requirements: for public assistance—*
Opinion of The Justices, Mass., 257 N.E.2d 94; Gaddis v. Wyman, 304 F.Supp. 717 (N.D.N.Y.1969) aff'd per curiam sub nom. Wyman v. Bowers, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970) ; Baxter v. Birkins, 311 F.Supp. 222 (D.Colo.1970) ; Barnett v. Lindsay, 319 F.Supp. 610 (D.Utah 1970) ; Morrison v. Vincent, 300 F.Supp. 541 (S.D. W.Va.1969).
*for public housing—*
Cole v. Housing Authority of City of Newport, *supra;* King v. New Rochelle Municipal Housing Authority, 442 F.2d 646 (2nd Cir. 1971), cert. denied 1971. 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107.
*for medical aid to indigents—*
Vaughn v. Bower, 313 F.Supp. 37 (D. Ariz.1970) aff'd 400 U.S. 884, 91 S.Ct. 139, 27 L.Ed.2d 129 (1970) ; Crapps v. Duval County Hospital Authority, 314 F.Supp. 181 (M.D.Fla.1970) ; Arnold v. Halifax Hospital District, 314 F.Supp. 277 (M.D.Fla. 1970) ; Valenciano v. Bateman, 323 F.Supp. 600 (D.Ariz.1971) ; cf. bar examinations Keenan v. North Carolina Board of Law Examiners, 317 F.Supp. 1350 (E.D.N.C.1970) ;
*therapeutic abortions—*
Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C.1971) ;
*for divorce—*
Wymelenberg v. Syman, 328 F.Supp. 1353 (E.D.Wis. 1971).

reality of the need for court protection of politically impotent minorities from majoritarian oppression. Cf. United States v. Carolene Products, 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Michelman, Foreword: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7, 47 (1969).

The motion for summary judgment is granted. This Court hereby declares that Chapter 290 of the 1971 Public Laws of the State of Rhode Island is unconstitutional facially and as applied to the plaintiffs and permanently enjoins its enforcement as being in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Defendants, their successors in office, agents and employees, are ordered to notify promptly, by first class mail at their last known address, all persons who have been denied public assistance because of Chapter 290, 1971 Public Laws of Rhode Island, that they are now eligible for such benefits and may reapply.

An order shall be prepared by plaintiffs reflecting this Court's ruling.