Hussein DEMIRAGH, on behalf of himself and all others similarly situated, Plaintiff,

v.

Joseph DeVOS, Director of Welfare, City of Stamford; Henry C. White, Commissioner of Welfare, State of Connecticut, Defendants.

Civ. No. 14700.

United States District Court, D. Connecticut.

Jan. 27, 1972.

Roger E. Koontz, Executive Director-Gen. Counsel Norwalk-Stamford-Danbury Regional Legal Services, Inc., Stamford, Conn., for plaintiff.

Edmund C. Walsh, Asst. Atty. Gen., of Conn., East Hartford, Conn., for Henry C. White, Comm'r.

Ronald M. Schwartz, Asst. Corp. Counsel, City of Stamford, Stamford, Conn., for Joseph DeVos, Director.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The original plaintiff, Hussein Demiragh, and the subsequent intervening plaintiff, Mildred Freeland, bring this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988; they claim jurisdiction in this Court under 28 U.S.C. §§ 2201 and 2202. They request a judgment declaring Municipal Ordinance No. 219 of the City of Stamford unconstitutional on its face and as interpreted and applied as to them and others of their class by the defendant City Welfare Director and the State Commissioner of Welfare.

Both plaintiffs petition the Court to permit this action to proceed in forma pauperis pursuant to 28 U.S.C. § 1915; and the Court has approved this request. They further request that the matter be declared a class action pursuant to the authority of Rule 23(a), Fed.R.Civ.P., and that the Court enjoin the defendants from denying public assistance to all members of the affected class. They represent that numerous members make up the affected class, who are otherwise eligible for public assistance under Conn.Gen.Stat. §§ 17–273, 17–292, but do not qualify under the challenged ordinance, which requires a one-year residence as a condition pre-

cedent to the establishment of eligibility for welfare assistance. This is an appropriate class action and the Court approves the granting of the plaintiff's motion. The Court finds the Stamford ordinance to be unconstitutional on its face and grants the plaintiff Freeland her prayer for equitable relief. The case of the original plaintiff, Demiragh, who permanently moved his residence to Texas prior to the court hearing, has now become moot and it is accordingly dismissed.

The City Director of Welfare and the State Welfare Commissioner have moved to dismiss the action pursuant to Rule 12(b), Fed.R.Civ.P. The former claims that the plaintiff Demiragh has no standing and no justiciable case or controversy is before the Court for adjudication. The State Welfare Commissioner represented that his statutory authority does not directly involve his office in the administrative application of the challenged ordinance and that he is not properly a party defendant.

■■■■ Counsel for the parties agreed that the plaintiff Demiragh obtained a job on November 4, 1971, as a professional engineer in Galveston, Texas; he vacated his abode in Stamford the following day and permanently moved out of the State of Connecticut. The Court finds that the plaintiff Demiragh's action has thus become moot and the suit is dismissed as to him. It further finds that the State Welfare Commissioner's statutory duties do not materially involve his office with the administration of the challenged city ordinance. He is therefore dismissed as a party defendant in this action.

On January 14, 1972, all counsel by written stipulation agreed that Mildred Freeland should be permitted not only to intervene as plaintiff, but that the evidence and arguments presented at the court hearing on November 8, 1971, together with the accompanying papers presented by the parties should be considered in the final adjudication of the case and that all further hearings and arguments are waived.[1]

The plaintiff-Freeland claims that she is eligible for assistance from the City of Stamford under §§ 17–273[2] and 17–292[3] of the Connecticut General Statutes, because she has no income, she is hospitalized without assets, and is unable to meet her current hospital and medical expenses. Section 17–273 defines the primary liability of each town to provide support for those who are in need of aid and have no relatives legally obliged to support them. Section 17–273, on the other hand, simply prescribes the standards and procedures for each town to establish eligibility for partial state reimbursement of its general welfare assistance expenditures. No evidence was actually presented concerning the establishment of minimum uniform standards by the State Welfare Commissioner concerning the granting of general assistance by the towns under the authority prescribed in § 17–

1. See Stipulation of Counsel.

2. Conn.Gen.Stat. § 17–273 provides:
"Each person who has not estate sufficient for his support, and has no relatives of sufficient ability who are obliged by law to support him, shall be provided for and supported at the expense of the town in which he resides, or, if he has no residence, of the town in which he becomes in need of aid. As used herein, the term 'reside' means 'occupy an established place of abode.' When such person is in need of hospital or convalescent home care, it shall be similarly provided, but that portion of the cost not reimbursed by the state under the provisions of section 17–292 shall be chargeable to the town in which the person resided continuously for the longest period of time in the two years immediately prior to the granting of such hospital or convalescent home care, if such town is other than the town in which he resided or was located when he became in need of such care."

3. Conn.Gen.Stat. § 17–292 provides in part:
"Each town, through its selectmen, shall, unless such support is otherwise provided for by the state, furnish necessary support to all paupers therein or sent from such town to any licensed institution. . . ."

3a; nor was there any evidence that the state had ratified, approved, or otherwise condoned the municipal ordinance being challenged.

### Jurisdiction

■ The threshold question is whether or not a judge of this Court, sitting alone, has jurisdiction to hear and rule upon the issues raised in the complaint and the plaintiff's prayer for relief, requesting a preliminary and a permanent injunction, to restrain the enforcement of the alleged unconstitutional municipal ordinance.

"The term 'statute' in § 2281 does not encompass local ordinances or resolutions. The officer sought to be enjoined must be a state officer; a three-judge court need not be convened where the action seeks to enjoin a local officer . . . unless he is functioning pursuant to a statewide policy and performing a state function. Spielman Motor Sales Co. v. Dodge, 295 U.S. 89 [55 S.Ct. 678, 79 L.Ed. 1322]. Nor does the section come into operation where an action is brought against state officers performing matters of purely local concern. . . . And, the requirement that the action seek to enjoin a state officer cannot be circumvented 'by joining, as nominal parties defendant, state officers whose action is not the effective means of the enforcement or execution of the challenged statute.' " Moody v. Flowers, 387 U.S. 97, 101–102, 87 S.Ct. 1544, 1548, 18 L.Ed.2d 643 (1966).

Since the challenged ordinance is local in scope and character, and this action having been brought to enjoin local officers acting on a local matter without statewide application, a single judge court is the proper forum to hear and decide the issues.

### Facts

On August 15, 1971, Stamford City Ordinance No. 219 became effective. Its title attests to its objectives:

*"DECLARING IT A HEALTH HAZARD WHEN VACANCY RATE IN HOUSING FALLS BELOW 2% AND THAT ANY PERSON BECOMING A STAMFORD RESIDENT DURING THIS TIME SHALL NOT BE ELIGIBLE FOR WELFARE BENEFITS, NOR SHALL BE ABLE TO RECEIVE SUCH BENEFITS."*

The context states:

"Whenever the vacancy rate in Housing, as reported by the Director of Health, shall fall below 2%, it shall be deemed to constitute a health hazard; and that any person who shall apply for welfare assistance who has not resided within the City of Stamford for one year prior to the date of said application, shall be ineligible for any assistance during the existence of said Health Hazard. However, the Department of Public Welfare shall be authorized to provide necessary temporary assistance or care until arrangements are made for said applicant's return.

"This Ordinance shall take effect upon its adoption."

The verified complaint of the plaintiff Freeland discloses that she arrived in Stamford from Maryland in October 1971. She proceeded to make her permanent residence there at 36 Garden Street, so that she might live nearer to her daughter. Prior to her removal to Connecticut, she had been receiving public assistance in Maryland. Her prior residence there qualified her for welfare benefits, which she continued to receive until on or about December 1, 1971. On the latter date, she was notified that she would receive no further benefit payments from that state. When the complaint was filed, she was a patient at St. Joseph's Hospital, in Stamford, Connecticut, suffering from a back injury; she was without assets, and unable to support herself.

### Issue

■ The issue presented is whether the residency requirement in Stamford

Ordinance No. 219, violates the Equal Protection Clause of the fourteenth amendment to the United States Constitution.

## Discussion

The Director of City Welfare testified that since the residence ordinance became law on August 15, 1971 (Tr. 22), he has received ten or more applications for welfare assistance from those ineligible for benefits, but because they had not established proof of residence for at least one year prior to filing application (Tr. 23), these have been denied. (Tr. 24, 74).

An Analysis Report[4] prepared by the Federal Housing Administration, as of August 1, 1969, discloses that there was a total of about 66,300 housing units in the Stamford Housing Market Area; this was a net gain of approximately 4,850 units since August 1, 1965. The increase resulted from the construction of about 5,450 units and the demolition of about 600 units. There were about 1,200 vacant housing units in August, 1969, but of this number only 230 were classified as "available vacant." Of this latter number, 130 were for sale (a homeowner vacancy rate of 0.3%) and about 100 were available for rent (a renter vacancy rate of 0.4%). The report went on to comment that both of those vacancy rates were extremely low, and that they provide evidence of a severe deficiency in the supply of both sales and rental housing.

This same report statistically disclosed the trend of the Stamford housing supply as follows: vacant housing units in April 1960—2,363; August 1965—2,000; and August 1969—1,200. It was indicated that some of these vacant units did not meet occupancy standards (Tr. 53) and that "available" vacant units in April 1960—1,242; August 1965—900, and August 1969—230. It is apparent from this report, that from the effective date of the new ordinance, the overall housing vacancy rate for owner and rental premises has been consistently below the 2% minimal vacancy rate prescribed by the ordinance. (Tr. 30, 38, 50, 52).

To substantiate these federal statistics at the local level, the City Health Director, Dr. Gofstein, stated that from the date of his assuming public office four years ago down to the present, he found that there was a severe and immediate crisis in housing. The housing inventory is inadequate and there are a number of units which are vacant, but unfit for human habitation. He asserted that this applied primarily to the categories of low income and moderate income housing. (Tr. 40). There existed no reliable official data disclosing whether or not there had been any recent increase in the number of migrants into the Stamford area. (Tr. 42). However, experience disclosed that where the City had recently condemned 23 units of case load occupants, it was found very difficult to find housing accommodations for them. Urban renewal development with its resulting displacement of families has aggravated an already tight housing situation. (Tr. 44).

The Health Department, through Dr. Gofstein, represented that it had made a sample survey (Tr. 38) about June 30, 1971, and out of 3,004 dwelling units inspected only 27 were found vacant and not all of these were available for rental. This ratio would indicate a vacancy rate of .89% (Tr. 45). Overcrowding constitutes 25% to 30% of all the deficiencies found in inspected housing. This occurred where more than one family was living in a housing unit designed for a single family. (Tr. 46). The Health Director represented that the population of the City in the past several years had grown more rapidly than the available housing facilities (Tr. 48).

The Mayor described the housing situation as a desperate emergency, wherein there was a terrible shortage of clean, safe and decent housing (Tr. 58). He

---

4. See Defendants' Exhibit "A".

stated that the proximity of Stamford to the Metropolitan New York area was a factor, which encouraged people to migrate. He explained that as bad as Stamford's housing situation was, it still was far better off than New York City.

His position was that the local government had an obligation to provide clean, safe, decent housing for the people already living in Stamford, and it would never have a chance to accomplish this, if others who are unable to take care of themselves kept "flocking in." (Tr. 59). He went on to describe the enlightened efforts of local government under the "Our Share" program as one of the first in the state designed to provide a sheltered work situation for welfare recipients who might be unable to compete in the open employment market, because of physical, psychological, or mental handicaps. (Tr. 60). He denied that the challenged ordinance was designed to halt migration but significantly stated, "there are people moving into Stamford every-day, who can take care of themselves." (Tr. 61). At the time of the adoption of this ordinance, it was known that the vacancy rate in housing was then less than 2%. He denied, however, that financial or fiscal reasons motivated the ordinance's adoption. (Tr. 62). He asserted that it was motivated for health reasons and none other. (Tr. 63).

For the fiscal year ending June 30, 1971, Stamford, with an estimated population of 111,300 people had total relief expenditures of $271,970.00; hospital costs were $77,000.00; and administrative and operating welfare costs amounted to $185,000.00. The state reimbursed the city $337,000.00, leaving a net cost for welfare for the fiscal year ending July 1, 1971, of $196,970.00. The Welfare Director represented that this net expenditure was but a fraction of a "mill" for the total local welfare expenditure. (Tr. 71). He too, expressed the opinion that this residency ordinance was not enacted for fiscal reasons (Tr. 72), but was necessary to cope with health situations where families insisted upon staying in Stamford, but could find no suitable shelter in which to live.

The President of the Board of Representatives (the municipal legislative body) stated that the primary purpose of the ordinance was to relieve overcrowding and the desperate health problem in housing; and its main purpose was not financial in nature. (Tr. 77).

There is no question here, but that the plaintiff Freeland's verified complaint qualifies her as being eligible for welfare assistance under the standards prescribed by §§ 17–3a and 17–273 of the Connecticut General Statutes. Furthermore, except for the restrictive residency provisions of the local ordinance, she qualifies as an eligible resident of Stamford. The issue clearly presented is whether or not the Town of Stamford may constitutionally establish two different eligibility standards for welfare beneficiaries of two classes, namely, those who have resided in the City one year or more and those who have not. Does this ordinance constitute an invidious discrimination, which denies equal protection of the laws to all and failing that is it constitutionally enforceable?

Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), recognized that such a residency requirement actually created two constitutionally impermissible classes of needy citizens. The Court said:

"There is no dispute that the effect of the waiting-period requirement in each case is to create two classes of needy resident families indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction. On the basis of this sole difference the first class is granted and the second class is denied welfare aid upon which may depend the ability of the families to obtain the very means to subsist— food, shelter, and other necessities of

life. In each case, the District Court found that appellees met the test for residence in their jurisdictions as well as all other eligibility requirements except the requirement of residence for a full year prior to their applications." (At 627, 89 S.Ct. at 1327).

At page 631, 89 S.Ct. at page 1329, it further asserted:

"(T)he purpose of deterring the immigration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible."

The Court added at page 634, 89 S.Ct. at page 1331:

"The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State to State . . . appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional."

The issue thus narrowed is whether the town has demonstrated a compelling government interest, namely, that it is confronted with a public health hazard, due to a lack of adequate housing. The Court recognizes that Stamford, like so many similar urban areas, has a scarcity of acceptable housing accommodations. Even in the face of that condition, can freedom of migration into that town be governmentally controlled and restricted, so as to permit an unlimited number of affluent, self-supporting migrants to move into town, but restrict the number of those migrants who are needy at the time of their entry or become in need of public assistance within one year after their removal. However otherwise described that is the practical effect, when two classes of eligibility for welfare are prescribed.

The town has the police authority to adopt suitable health codes restricting the occupancy of buildings, houses, tenements or apartments, so that their occupancy will not cause municipal health hazards. This authority includes the right to require certification of compliance with minimal maintenance and occupancy standards for both rental and owner housing, so as to safeguard the health, safety and welfare of the occupants, and also to control the number of families or the number of individual occupants which may be permitted to live in those housing facilities. The City has failed to demonstrate that the ordinance is "necessary" and essential to provide for a compelling governmental interest. Shapiro v. Thompson, 394 U.S. at 634, 89 S.Ct. 1322.

However otherwise described, Ordinance No. 219 denies welfare benefits to otherwise eligible applicants, solely because they have recently moved into town. These new residents are entitled to the same equality of legal rights and privileges as all other citizens under non-discriminatory laws; and this includes the unquestioned right of all citizens to enter and reside in any state or town in the United States, provided they find shelter in which to live, which is within the prescribed standards of the law. The challenged ordinance imposes additional burdens upon the constitutional right of citizens to have unrestricted movement and to establish residence where they choose to locate and can find residence without being denied that opportunity because of their economic status.

The Connecticut State Legislature in its preamble to House Bill No. 9508, Special Act No. 1, June Session 1971, unsuccessfully attempted to establish a "compelling state interest" as a justification for its minimum residence requirements. The Court in passing upon that law's constitutionality said:

"The state cannot, however, ignore the Constitution and the Supreme Court's

decision in Shapiro v. Thompson, and alleviate its problems by an arbitrary discrimination against some of its people resident in the state by classification on the basis of length of residence.

"Since the Court decided *Shapiro*, the lower courts have uniformly struck down all manner of attempts to establish durational residency requirements for state and local welfare. Only recently the Supreme Court in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), (June 14, 1971) (Blackmun, J.) reaffirmed its continued adherence to the principles set forth in *Shapiro* in invalidating statutes which conditioned an alien's welfare eligibility upon his length of residence in this country." Rivera v. Dunn, 329 F.Supp. 554, 556 (D.Conn.1971), affirmed without hearing, 404 U.S. 1054, 92 S.Ct. 742, 30 L. Ed.2d 743 (1972).

The City failed to establish a necessary connection between the ordinance's one-year residency classification, as a qualifying condition precedent to establishing eligibility for welfare assistance and the claim that its objectives were to alleviate a health hazard, because of inadequate local housing. The Court finds Ordinance No. 219 to be unconstitutional on its face, because it violates the Equal Protection Clause of the fourteenth amendment.

The defendant, Joseph DeVos, Director of Welfare of the City of Stamford, his agents and employees, are permanently enjoined from enforcing the ordinance's one-year residency provisions and he is directed to grant welfare relief benefits to the plaintiff, Mildred Freeland, and to all others in the normal course who would otherwise be eligible under the law.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P.

So ordered.