Hussein DEMIRAGH, on behalf of himself and all others similarly situated, Plaintiff-Appellee,

and

Mildred Freeland, Intervening Plaintiff-Appellee,

v.

Joseph DeVOS, Director of Welfare, City of Stamford, Defendant-Appellant.

No. 431, Docket 72–1421.

United States Court of Appeals, Second Circuit.

Argued Feb. 15, 1973.

Decided April 10, 1973.

Ronand M. Schwartz, Asst. Corporation Counsel (J. Robert Bromley, Corporation Counsel, Stamford, Conn., of counsel), for defendant-appellant.

Roger E. Koontz, Stamford, Conn., for plaintiff-appellee and intervening plaintiff-appellee.

Before FRIENDLY, Chief Judge, OAKES, Circuit Judge, and DAVIS, Judge.[*]

OAKES, Circuit Judge:

The City of Stamford, Connecticut, appeals from a judgment of District Judge Clarie declaring Municipal Ordinance 219 unconstitutional on its face, as in violation of the equal protection clause. The ordinance's title states its purpose:

DECLARING IT A HEALTH HAZARD WHEN VACANCY RATE IN HOUSING FALLS BELOW 2% AND THAT ANY PERSON BECOMING A STAMFORD RESIDENT DURING THIS TIME SHALL NOT BE ELIGIBLE FOR WELFARE BENEFITS,

[*] Of the United States Court of Claims, sitting by designation.

NOR SHALL BE ABLE TO RECEIVE SUCH BENEFITS.[1]

We agree with Judge Clarie that, because the ordinance did not have state wide effect, 28 U.S.C. § 2281 did not require the convening of a three-judge court, D.C., 337 F.Supp. 483. Moody v. Flowers, 387 U.S. 97, 101–102, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967). We agree also that the durational residence requirement is invalid under Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); King v. New Rochelle Municipal Housing Authority, 442 F.2d 646 (2d Cir.), cert. denied, 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971); and Rivera v. Dunn, 329 F. Supp. 554, 556 (D.Conn.1971) (three-judge court), aff'd summarily, 404 U.S. 1054, 92 S.Ct. 742, 30 L.Ed.2d 743 (1972).

The intervening plaintiff[2] Freeland moved from Maryland, where she was receiving public assistance, to Stamford in October of 1971 to live near her daughter. On December 1, 1971, she was notified by the Director of City Welfare that she was ineligible under the ordinance to receive further payments. She would otherwise have been entitled under §§ 17–3a and 17–273 of the Connecticut General Statutes to receive them. At the time of filing her intervening complaint on January 14, 1972, she was a patient at a Stamford hospital suffering from a back injury, without assets and unable to support herself.

The trial court received evidence from the Director of City Welfare to the effect that Stamford had since the ordinance was adopted on August 15, 1971, at all times had a housing vacancy rate below the 2 per cent prescribed by the ordinance. The City Health Director testified to a housing crisis, with inadequate numbers of units, and overcrowding. The Mayor testified as to Stamford's problems with people "flocking in" from New York City and claimed that the ordinance had a health, not a fiscal, purpose.[3] But the trial court found, and we wholly agree, that "[t]he City failed to establish a necessary connection between the ordinance's one-year residency classification, as a qualifying condition precedent to establishing eligibility for welfare assistance, and the claim that its objectives were to alleviate a health hazard, because of inadequate local housing."

The only connection that the City really advances, to quote from its brief, is that

to allow in-migrants who are in need of welfare benefits to continue to locate in Stamford, completely without any limitation when there is insufficient housing available for them, would create and is creating a severe and discriminatory hardship to those residents already living in the City,

1. The text of the ordinance is as follows:

Whenever the vacancy rate in Housing as reported by the Director of Health, shall fall below 2%, it shall be deemed to constitute a health hazard; and that any person who shall apply for welfare assistance who has not resided within the City of Stamford for one year prior to the date of said application, shall be ineligible for any assistance during the existence of said Health Hazard. However, the Department of Public Welfare shall be authorized to provide necessary temporary assistance or care until arrangements are made for said applicant's return.

This Ordinance shall take effect upon its adoption.

Stamford, Conn., City Ordinance No. 219 (Aug. 15, 1971).

2. The original plaintiff's case was mooted rather ironically by his leaving Stamford for Texas.

3. This was substantiated by figures showing that during the fiscal year ended June 30, 1971, Stamford with an estimated population of 111,300 people had total relief expenditures of $271,970; hospital costs of $77,000; and administrative and operating expenses of $185,000. Since the State reimbursed the city $337,000 the net cost to the city was only $196,970.

but who have been unable to find decent housing.

◼ Under any approach we might take to equal protection analysis, the Stamford ordinance cannot be sustained by this state interest. We say this without in any way failing to recognize that the right to travel abridged by the Stamford ordinance has only recently been reaffirmed as a "fundamental" one, requiring the showing of a "compelling" state or local interest to warrant its limitation. Graham v. Richardson, *supra*; Shapiro v. Thompson, *supra*. See also Rivera v. Dunn, *supra* (summary affirmance). Indeed, only the other day the "fundamental right"-"compelling state interest" formulation was referred to with approval in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); see also Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). One may inquire whether, under the circumstances that the City relies upon, hardship to present residents, *all* "in-migrants" should not be excluded from Stamford, not just those "who are in need of welfare benefits. . . ." [4]

But even under the narrower test recently explicated in our own Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir., 1973), at 813, whether absent a "fundamental right" the legislative classification is *in fact* substantially related to the object of the statute, the statute would fail. See also Gunther, The Supreme Court, 1971 Term, Foreword, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). As mentioned above, the classification drawn by the statute is grossly underinclusive in terms of the statute's objective. Unless one assumes that welfare payments are so substandard as not to permit locating "healthful" Stamford housing and that all non-recipients of welfare can afford and find such "healthful" Stamford housing, the rationality of the classification between those who require welfare and those who do not becomes even more doubtful. When added to this questionable classification is another classification between those who apply for welfare after residing in Stamford for one year and those who do so after residing for a shorter period of time, the "rationality" of the ordinance totally escapes one; why not make the standard for eligibility ten year' residence, or twenty, since each higher limit would presumably do more to eliminate Stamford's housing crisis. Given the nature of the classification made by the Stamford ordinance, it is doubtful whether it would survive even the "minimum rationality" test of the old equal protection analysis, Shapiro v. Thompson, *supra*, 394 U.S. at 638, 89 S.Ct. 1322; King v. New Rochelle Municipal Housing Authority, *supra*, 442 F.2d at 649, much less any higher standard.

◼ The City, presumably not with tongue in cheek, argues that "A man who is provided with food and clothing by a municipality but is fortuitously deprived of decent shelter is the unwitting victim of municipal despair." Wherever the remedy may lie, through federal housing aid, revenue sharing, making other cities and areas more attractive to welfare recipients, changing the welfare system, providing more jobs and job training for the indigent, or doing some thing else, it is constitutionally impermissible for a

4. One might also inquire whether Stamford had taken adequate steps to provide suitable housing. *Cf.* Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). Furthermore, as Judge Clarie pointed out below, Stamford has many other resources, including health and building codes, to insure the quality of its current housing supply. However unpleasant it may be to those in charge of city affairs to contemplate, there are other ways of meeting the problems of an urban area with an "in-migration" of poor people than erecting a wall around the city to exclude them, either by a "health" ordinance, as here, or by exclusionary zoning or otherwise. *See* Note, The Equal Protection Clause and Exclusionary Zoning After Valtierra and Dandridge, 81 Yale L.J. 61 (1971).

municipality to wall welfare recipients out. We could say more accurately perhaps that if Stamford's ordinance were upheld other cities would, we suspect, quickly follow suit with similar ordinances, to wall welfare recipients *in* the ghettos and urban slum areas where they now live.[5] This court, unless and until directed otherwise by higher authority, will have no part of this, however much we may sympathize with the plight or dilemmas of the cities confronted with the problem of housing the poor.

Judgment affirmed.

5. Income group clustering of the poor in the central city is a common phenomenon of the demography of American metropolitan areas and suburban land use restrictions may aggravate the phenomenon. *See* Branfman, Cohen & Trubeck, Measuring the Invisible Wall: Land Use Controls and the Residential Patterns of the Poor, 82 Yale L.J. 483 (1973). The Stamford ordinance here, were it widely adopted, would be another device insuring the isolation of the urban poor. As the Mayor of Stamford here conceded, as bad as Stamford's housing situation was, it still was far better off than New York City's.